**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Willie TERRY, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Eric NALVEN, Robert Guippone, Willard Williams, Onzelo Markum, Clarence Haynes, Saint Julian Harrison, Paul Jenkins, and Anthony Michael Porcelli, Defendants-Appellants.**

Nos. 346–47, 348, 349–50, 385, 388, 426, 892, Dockets 82–1125, 82–1175, 82–1177, 82–1179, 82–1181, 82–1183, 82–1189, 82–1185, 82–1187.

United States Court of Appeals,
Second Circuit.

Argued Dec. 1, 1982.

Decided Feb. 18, 1983.

Certiorari Denied May 16, 1983.
See 103 S.Ct. 2095.

soned elaboration from the Board, and simplifying the task of the reviewing court.

Bennett M. Epstein, New York City, for defendant-appellant Terry.

Stanley Neustadter, New York City, for defendant-appellant Nalven.

Martin G. Weinberg, Boston, Mass. (Oteri, Weinberg & Lawson, Boston, Mass., of counsel), for defendants-appellants Guippone and Porcelli.

Jay Goldberg, New York City, for defendant-appellant Williams.

Theodore Krieger, New York City, for defendant-appellant Markum.

Richard A. Greenberg, New York City, for defendant-appellant Haynes.

Salvatore F. Quagliata, Ozone Park, N.Y., for defendant-appellant Harrison.

Jeffrey L. Greenup, New York City, for defendant-appellant Jenkins.

Richard A. Martin and Kate Stith Pressman, Asst. U.S. Attys., New York City (John S. Martin, Jr., U.S. Atty. for S.D. N.Y., Walter P. Loughlin, Asst. U.S. Atty., New York City, of counsel), for plaintiff-appellee.

Before LUMBARD, MANSFIELD and KEARSE, Circuit Judges.

MANSFIELD, Circuit Judge:

Defendants appeal from judgments of the Southern District of New York convicting them of federal narcotics violations arising out of the same core of operative facts. One indictment (S 81 Cr. 398) charged (1) seven of the appellants (all but Terry) and 10 others[1] with conspiracy to possess and distribute heroin and cocaine in violation of 21 U.S.C. § 846 (Count 1), (2) defendant Willard Williams with organizing and supervising a continuing criminal enterprise in violation of 21 U.S.C. § 848 (Count 2), and (3) various defendants with possession of large quantities of heroin and cocaine in violation of 21 U.S.C. § 841(a)(1) (Counts 3 to 15) and illegal use of the telephone to further the narcotics conspiracy in violation of 21 U.S.C. § 843(b) (Counts 16 to 25). Defendant Williams pleaded guilty to Count Two (criminal enterprise) preserving by stipulation three pretrial suppression claim issues for appeal.[2] The other six appellants were convicted of the conspiracy count and the related substantive offenses charged after a six-week jury trial before Judge Richard Owen.[3] We reverse the judgment convicting appellant Haynes of conspiracy and illegal use of a telephone.[4] Finding no merit in the other claims of error, we affirm the judgments convicting Williams, Porcelli, Guippone, Harrison, Markum, and Nalven.

A second indictment (S 81 Cr. 426) charged Terry in three counts with similar narcotics violations (conspiracy with Williams and another to distribute heroin and cocaine, possession with intent to distribute 19.4 grams of cocaine and diluents, use of telephone to facilitate conspiracy). After a non-jury trial before Chief Judge Constance Baker Motley, Terry was convicted of all counts and placed on probation for two years. We affirm.

Viewed most favorably to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the evidence showed that during the period from October 1980 to May 1981 Williams managed from his duplex apartment on East 89th Street, New York City, a continuing narcotics business in which he received and processed wholesale quantities of heroin and cocaine, re-sold these drugs to distributors, paid back the suppliers, laundering and banking the profits, and that all but one of the other seven appellants played active roles in the business, either as suppliers, purchasers, or facilitators (e.g., money launderers, drug testers). Defendants Porcelli and Guippone were the main suppliers of wholesale quantities of heroin and cocaine to Williams. The distributors included appellants Harrison, Markum, Nalven, Terry and various co-defendants. Harrison also became a supplier of cocaine to Williams when he was unable to pay Williams for the heroin he had distributed. This heroin had been supplied by Guippone and Porcelli. Nalven, in addition to acting as a distributor, assisted Williams in testing for purity drugs being supplied to Williams and "laundering" some of the large cash receipts from sales, i.e., arranging to bank the funds as coming from legitimate sources.

1. Of the 10 remaining individuals, 8 pleaded guilty before trial; one, "Bobby" James, was acquitted after trial; and one is a fugitive. One of the defendants, Paul Jenkins, who pleaded guilty before Judge John M. Cannella, and sought to join in this appeal pursuant to F.R. A.P. 28(i), did not preserve any issues for appeal. Accordingly, we affirm his conviction.

2. Williams was sentenced to life imprisonment without parole. By separate order we reject Williams' claim that his guilty plea should be vacated because of alleged assurances with respect to the sentence he would receive.

3. Porcelli, Guippone, and Harrison were sentenced to 30-year terms of imprisonment with lifetime special parole. Haynes and Markum received 15-year sentences of imprisonment with lifetime special parole. Nalven was sentenced to 3 years imprisonment. Williams, Porcelli, Guippone and Haynes, as previously convicted federal narcotics violators, were subject to enhanced penalties pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 851.

4. The government concedes that Haynes' term of special parole was improper. *Bifulco v. United States,* 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980).

The evidence establishing the existence and operations of the narcotics enterprise consisted mainly of (1) testimony of Drug Enforcement Administration (DEA) agents who made an initial purchase of heroin from one of Williams' distributors and engaged in months of continuous surveillance of the defendants, (2) papers and articles retrieved from bags of Williams' trash placed on the sidewalk outside his apartment for collection, (3) pen registers, photographs, video tapes and court-authorized electronic surveillance of conversations among the appellants, (4) post-arrest admissions by some defendants, and (5) articles seized at the time of arrest of some, including one kilogram of cocaine found in Williams' apartment, $400,000 in safety deposit boxes controlled by him ($14,500 of which was part of $40,000 previously paid by DEA undercover agents for the purchase of heroin), firearms and ammunition found in the premises of Harrison, Guippone and Nalven, and cocaine from Harrison's automobile.

The government's investigation into the defendants' narcotics activities began on October 24, 1980, when a DEA agent, Zenford Mitchell, purchased one-eighth of a kilogram of heroin for $40,000 from a previously-convicted narcotics dealer, Steward, who obtained the heroin from an apartment building at 307 East 89th Street, New York City, where defendant Williams, a twice-convicted narcotics distributor, rented and occupied a ground-floor duplex apartment ("J" and "1J") under the name Felix Davis, with telephones registered in other names. Further surveillance, use of an informant, and an interview with the owner of the apartment building, provided reasonable grounds for the belief that the source of the narcotics was the Williams' duplex. For instance, Steward was seen on two occasions entering that apartment, after dialing the Williams' apartment phone number from a nearby public phone. On October 31, 1980, a week after the DEA agent's purchase of the heroin through Steward, defendants Porcelli and Guippone, previously convicted federal narcotics violators, were observed visiting the apartment, departing with a large closed paper bag and driving off with it. More visits to the Williams' apartment by Porcelli and Guippone followed.

Noting that Williams left his garbage in a green bag closed with a brown tape in the public corridor of his apartment to be brought out to the sidewalk for pick-up by the trash collector, DEA agents periodically removed some of the bags from the sidewalk, which yielded evidence identifying Williams and incriminating him and others. Among the items recovered from the trash was a note in Williams' handwriting dealing with a large-scale heroin transaction; records in code numbers of the financial accounts of various narcotics distributors, including payments and amounts owed; wrappers for mannite, a substance used to dilute heroin; traces of cocaine; and a record of large-scale narcotics sales. Pen registers[5] connected to the Williams' phone lines from outside his apartment recorded the making and phone numbers of calls to Porcelli, Steward and Harrison. Numerous persons were observed visiting the Williams' apartment, including Harrison, Porcelli, Guippone, defendants Paul Jenkins and Bernard Henderson (from whom DEA agents had purchased heroin).

On February 18, 1981, Judge Robert J. Ward of the Southern District of New York, upon the application of the DEA agents, approved in writing by Sanford M. Litvack, Assistant Attorney General of the United States, supported by an affidavit attesting to the foregoing information, authorized the installation of two listening devices ("bugs") in the living room (Apt. J) located downstairs in the Williams' duplex to record pertinent conversations "from the

---

**5.** A pen register is a device installed on a telephone line outside of the subscriber's home that records the electronic impulses made when outgoing calls are dialed. The device perforates a tape, indicating the date, time, and number dialed. The tape does not show whether the receiving telephone was answered, nor whether there was any conversation. The device on Williams' telephone also determined the origin of incoming calls. See J. Carr, *The Law of Electronic Surveillance,* § 3.02[3][b][ii] at 74 (1977 and Supp.1979).

premises known as the first floor of duplex Apartment J," which was connected to the upstairs bedroom (known as "1J") by a large open stairway.[6] Thereupon police officers, posing as telephone repairmen, installed two bugs in the Williams' living room, one in a wall jack near the floor, and the other in a telephone having a standard 7–8 foot cord, which was too short to permit a person to carry the phone upstairs to Williams' bedroom unless the cord was lengthened.

Over the next few months DEA agents recorded scores of conversations in the Williams' apartment which, with the agents' surveillance and evidence already uncovered, clearly established the existence of the above-described continuous narcotics enterprise and the participation in it of all of the appellants except Haynes. Porcelli and Guippone visited the Williams' apartment on numerous occasions, carried out packages and had discussions with Williams regarding purchases of heroin and cocaine, amounts of money paid and owed, and problems in obtaining payment from Harrison. On March 6, 1981, for instance, they visited Williams, received $30,000 from him, and arranged to supply him with three-quarters of a kilogram of cocaine. On March 16, 1981, Porcelli received $30,000 from Williams and agreed to hold an eighth of a kilo of heroin for him. Although Porcelli and Guippone suspended deliveries when they discovered that their car was being surveilled in mid-March 1981 after a visit to Williams, Porcelli on April 29, 1981, resumed discussions with Williams regarding methods of continuing narcotics sales on a more secure basis to avoid government surveillance. When Porcelli was arrested on May 31, 1981, he instructed his daughter to tell his son-in-law, "George" (Valenti) to "get rid of" the narcotics. There was evidence from which it could be inferred that Porcelli had kept a "stash" of narcotics at Valenti's house. When Guippone was arrested he had 300 rounds of ammunition in his car and he denied knowing anyone named Williams or Felix Davis. However,

in his wallet Guippone had several telephone numbers for Harrison in Williams' handwriting, as well as the address of Williams' daughter.

The electronic evidence against Harrison was equally incriminating and, coupled with the agents' surveillance and other evidence, revealed that Harrison was one of Williams' distributors until he fell behind in payments of money owed Williams for narcotics supplied by Porcelli and Guippone, whereupon Harrison sought to deliver cocaine to Williams in lieu of cash to repay his debt. For instance, on March 12, 1981, Harrison delivered 1½ kilograms of cocaine to Williams, which proved to be unsatisfactory. Thereupon, on March 15, 1981, he delivered almost 2 kilos of cocaine to Williams. Williams was later overheard to say that on March 25, 1981, Harrison again delivered a kilogram of cocaine to Williams. When arrested, Harrison had one of Williams' phone numbers which he had obtained on a visit to the latter's apartment. A later search of Harrison's premises and car uncovered a sawed-off shotgun, hundreds of rounds of ammunition, some cocaine, and writings identified as heroin accounting sheets.

Onzelo Markum, Williams' younger brother, also known as "Junior," was taped discussing with Williams sales and deliveries of cocaine. For instance, on April 18, 1981, he advised Williams that he was bringing over "that girl" (code term for cocaine) and arrived one-half hour later, turning the cocaine over to Williams. His name was on Williams' narcotics accounting sheets. In addition to assisting his brother in the purchase and sale of narcotics he exchanged large amounts of cash proceeds ($30,000 to $40,000 a day according to Williams) at midtown banks.

Eric Nalven played several roles in the conspiracy, including that of narcotics tester and money launderer. When Agent Mitchell made his initial purchase from Steward he was told that he could use the back room of Nalven's bar to test the heroin sold. Although Nalven conceded purchasing cocaine from Williams for personal use

**6.** The order was renewed on April 2, 1981 for an additional 30 days.

in small gram amounts for $100 to $200, on several occasions he visited Williams' apartment and received cocaine in quantities associated with dealing rather than personal use, i.e., a purchase for $2,000 on one occasion and on other occasions amounts of cocaine that could be subdivided on others.

There was also evidence that Nalven acted as a money exchanger and narcotics-tester for Williams. The latter stated on one occasion, in offering to pay $150 for every $10,000 laundered, that Nalven had been "getting rid of five or six [thousand] for me a week." The tapes further revealed that at times when Williams received narcotics from a supplier he would ask "Eric" to test it and advise the supplier of the results, and that Nalven showed Williams how to use a microscope, an instrument Williams used to test cocaine for purity. After Williams' arrest his microscope was found to have traces of cocaine on it. When arrested Nalven falsely told the DEA agents that he never used cocaine.

The evidence against appellant Clarence ("Legs") Haynes was almost entirely hearsay: records taken from Williams' trash referring to "Legs" along with others listed as narcotics distributors; mention by Williams of Haynes as the person who used defendant Bobby James (who was acquitted) as a narcotics courier; and Williams' end of a conversation, purportedly with Haynes, in which Williams asked Haynes to tell Gabe McMillan[7] "about shirts (a code word for narcotics) that he had passed." The non-hearsay evidence against Haynes consisted of a short phone conversation with Williams in which the former asked "what's happening" and the latter replied "ain't nothing happening;" admissions by Haynes upon arrest that he was known as "Legs," and that he knew Williams and Harrison and had spoken with them on the telephone but not about narcotics; and an address book containing names of alleged

drug traffickers and a narcotics price list, which was found in an apartment he shared with James who testified that the book belonged to him and that the entries were made by him, not Haynes.

Appellant Willie Terry, who was tried separately before Chief Judge Motley, does not challenge the sufficiency of the evidence against him, which consisted of records of telephone calls by Williams to Terry's apartment; tape-recorded conversations between the two regarding efforts to purchase narcotics; records of "Terry" narcotics transactions found in Williams' trash; vials containing cocaine residue found on Terry when arrested; and a scale, small amount of marijuana and business card with "Davis" (Williams' alias) on it, all of which were seized from his apartment during a search incident to the execution of an arrest warrant.

Judge Owen, after evidentiary hearings, denied in reasoned opinions defendants' motions to suppress evidence derived from the retrieval and search of Williams' trash and the electronic surveillance of Williams' apartment and telephone. Likewise Chief Judge Motley, after an evidentiary hearing, denied in a written opinion Terry's motion to suppress the evidence seized from his apartment.

## DISCUSSION

A. *CLAIMS COMMON TO ALL APPELLANTS*

1. *Searches of Williams' Trash*

■ Williams contends that the warrantless searches by DEA agents over a six-month period of his trash bags, which were set out for collection in sealed opaque bags, violated his reasonable expectation of privacy and that evidence so obtained tainted the legality of the electronic surveillance order.[8] We disagree.

---

7. McMillan, separately indicted, was convicted after a jury trial and sentenced to a 3-year term of imprisonment by Judge Robert W. Sweet. His conviction was affirmed by summary order on July 2, 1982. *United States v. McMillan,* 697 F.2d 300 (2d Cir.1982).

8. Although all appellants join in Williams' challenge to the legality of seizure of evidence from his trash, only Williams has standing to assert that the searches violated the Fourth Amendment. *Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 425–26, 58 L.Ed.2d 387 (1978).

In the absence of evidence indicating an intent by the former owner to retain some control over or interest in discarded trash, his placement of it for collection on a public sidewalk is inconsistent with the notion that he retains a privacy interest in it. His act is one of abandonment. *Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960); *United States v. Vahalik,* 606 F.2d 99, 101 (5th Cir.1979), *cert. denied,* 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980); *United States v. Shelby,* 573 F.2d 971, 973–74 (7th Cir.), *cert. denied,* 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978); *Magda v. Benson,* 536 F.2d 111, 112 (6th Cir.1976) (per curiam); *United States v. Mustone,* 469 F.2d 970, 972 (1st Cir.1972); *United States v. Dzialak,* 441 F.2d 212, 215 (2d Cir.), *cert. denied,* 404 U.S. 883, 92 S.Ct. 218, 30 L.Ed.2d 165 (1971); but see *People v. Krivda,* 5 Cal.3d 357, 96 Cal. Rptr. 62, 486 P.2d 1262 (1971), *remanded,* 409 U.S. 33, 93 S.Ct. 32, 34 L.Ed.2d 45 (1972), *aff'd on both state and federal constitutional grounds,* 8 Cal.3d 623, 105 Cal. Rptr. 521, 504 P.2d 457, *cert. denied,* 412 U.S. 919, 93 S.Ct. 2734, 37 L.Ed.2d 145 (1973).

■ When plastic trash containers and their contents are picked up by the collector and carted to a public waste disposal area, common experience teaches that the former owner obtains no implicit assurance that the trash will remain inviolate or free from examination. Indeed, once the trash is discarded the former owner rarely has any further interest in it other than to be assured that it will not remain at his doorstep. In the rare instance when he desires to preclude inspection by others of private papers in his garbage he may do so by first shredding or burning them or by hand-de-

livering the papers to a garbage-grinding machine. We do not view the mere use of taped opaque containers as indicating an intent to retain a privacy interest; these containers, apparently the most commonly-available type sold, are obviously designed to assure tidiness in appearance rather than privacy.[9] Such containers are hardly safety deposit boxes. In any event, even though the presence of other circumstances may indicate an intent to retain a privacy interest in trash (e.g., written restrictions on containers or retention of containers on private property until collected), the circumstances in this case clearly evidence abandonment by Williams of his trash. Accordingly, we affirm the district court's denial of his motion to suppress the evidence seized from the trash searches.

### 2. Challenges to Electronic Surveillance in Williams' Apartment

All appellants challenge on several grounds the court-authorized electronic surveillance in Williams' apartment. Their first ground, that evidence derived from illegal trash searches was used to obtain the eavesdropping order, is rejected for reasons already stated and because the application for the order disclosed probable cause independent of the trash-derived evidence. See *Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978).

■ Appellants next contend (1) that the affidavit supporting the original application for the room bugs was inadequate because it did not assert that all other less intrusive investigative techniques were unlikely to succeed as is required by 18 U.S.C. §§ 2518(1)(c) and (3)(c),[10] and (2) that the

---

**9.** Since items found in closed containers during a lawful search do not require a separate warrant, *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), *a fortiori,* there is no requirement to obtain a warrant to search sealed items that are discarded on a public street for collection.

**10.** Title 18 U.S.C. § 2518(1)(c) provides that an application for an order for interception of wire or oral communications shall include "a full and complete statement as to whether or not

other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Section 2518(3)(c) requires the judge in an ex parte order authorizing the interception to determine on the basis of the facts submitted by the applicant that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

order renewing the authorization for an additional 30 days was invalid because the supporting affidavit was a mere "boilerplate" repetition of the facts set forth in the earlier affidavit.

We hold that the affidavits were adequate. The original affidavit disclosed the standard investigative procedures that had been tried and explained why their continued use would be unproductive. It explained that Williams rarely left his apartment and would not meet with someone he did not know; that a search of his apartment would not reveal his narcotics stash which he kept nearby; and that the co-conspirators previously contacted, Jones and Steward,[11] had become suspicious and refused to deal further with undercover agents. The affidavit further indicated the agents' inability through physical surveillance to establish the significance of the meetings between the suspects; a record of their conversations was therefore essential.

■■■ An affidavit describing the standard techniques that have been tried and facts demonstrating why they are no longer effective is sufficient to support an eavesdropping order even if every other possible means of investigation has not been exhausted. *United States v. Todisco*, 667 F.2d 255, 258–59 (2d Cir.1981), *cert. denied*, 455 U.S. 906, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982); *United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979) (quoting *United States v. Hinton*, 543 F.2d 1002, 1011 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976)). Agents are not required to resort to measures that will clearly be unproductive. When, as here, a defendant (Williams) conducts his narcotics business only on a face-to-face basis from his apartment, it is unnecessary for government investigators first to seek a wiretap before applying for an eavesdropping order since a bug, not a wiretap, would provide the evidence sought. Since the factual justification for the order had not changed at the time when an extension was sought, it was unnecessary to vary the specific facts, admittedly accurate, in the renewal application. *Todisco, supra,* 667 F.2d at 259.

Appellants next argue that the order should be invalidated because it was signed by an Assistant Attorney General who lacked authority. We disagree. On January 19, 1981, the last day of the administration of President Carter, the then Attorney General Benjamin Civiletti executed Order No. 931–81 pursuant to 18 U.S.C. § 2516(1)[12] designating the four Assistant Attorneys General in charge of the Criminal Division, the Tax Division, the Office of Legal Counsel, and the Antitrust Division, in that order, to exercise the power of the Attorney General, in his absence, to authorize appropriate applications for electronic surveillance by federal agencies. Each designee was authorized to exercise the power in the event all those listed ahead of him were "not in the District of Columbia or ... otherwise not available."

Civiletti was replaced the following day, January 20, 1981, by Attorney General William French Smith when the new administration took office. On February 2, 1981, hold-over Assistant Attorney General Sanford M. Litvack, head of the Antitrust Division and fourth on Civiletti's priority list of assistants, authorized an application for court-ordered electronic surveillance of Williams' apartment. On February 27, 1981, Attorney General Smith issued his own designation Order No. 934–81, which did not expressly redesignate the authorization of his predecessor.

■■■ Appellants first contend that the Litvack authorization on February 2 was inadequate because it failed to recite the necessary precondition to Litvack's exercise of power, namely that the three other As-

---

11. Steward was charged in a separate indictment. Jones was an unindicted co-conspirator.

12. Title 18 U.S.C. § 2516(1) provides that "[t]he Attorney General, or any Assistant Attorney General specially designated by the At-

torney General, may authorize an application to a Federal judge ... for ... an order authorizing or approving the interception of wire or oral communications ...."

sistant Attorneys General with higher priority in the Civiletti order were absent or otherwise unavailable. We reject this contention. Litvack, a named designee whose high office gave him statutory power to authorize electronic surveillance orders, is presumed to have properly exercised that power and the condition precedent is presumed to have been met unless the defendants offer evidence, apart from mere conjecture or speculation, to rebut this presumption. *United States v. Todisco,* 667 F.2d at 259; *United States v. Jabara,* 618 F.2d 1319, 1327 (9th Cir.), *cert. denied,* 446 U.S. 987, 100 S.Ct. 2973, 64 L.Ed.2d 845 (1980); *United States v. Turner,* 528 F.2d 143, 151 (9th Cir.), *cert. denied,* 423 U.S. 996, 96 S.Ct. 426, 45 L.Ed.2d 371 (1975). No such evidence was offered in this case.

■ Appellants further claim that Order No. 931–81 was invalid because Assistant Attorney General Litvack's power as a designee of Attorney General Civiletti had expired when Mr. Civiletti left office and was no longer responsive to the political process as required by *United States v. Giordano,* 416 U.S. 505, 520, 94 S.Ct. 1820, 1829, 40 L.Ed.2d 341 (1974). This claim is meritless. Unlike *Giordano,* there is no suggestion here that Assistant Attorney General Litvack did not sign the order approving the application or that he was not specially designated by Mr. Civiletti. Administrative continuity requires that the designation by an outgoing Attorney General of Assistants to authorize electronic surveillance remain valid at least for a reasonable time after the Attorney General leaves office, even without an express redesignation by his successor. *Todisco,* 667 F.2d at 259 (citing *In re Weir,* 520 F.2d 662, 667 (9th Cir.1975)); *United States v. Mallory,* 507 F.Supp. 99, 102 (D.Md.1981). Otherwise the power of the office of Attorney General would in this important respect grind to a halt when an incumbent Attorney General departed and thereafter remain paralyzed until his successor was sworn in and acted. That the change in office resulted from a change in administration, with a possibly different electronic surveillance policy, does not alter the principle of administrative continuity when, as here, the incumbent Attorney General on February 27, 1981, impliedly ratified the designation of his predecessor, thereby eliminating the possibility that prior electronic surveillance policy could escape review by a politically accountable official of the current administration.

■ Appellants next argue that the two eavesdropping devices ("bugs"), which were placed in the downstairs living room of Williams' duplex apartment, intercepted conversations that occurred upstairs in the apartment. Appellants argue that the interception of upstairs conversations violated both Judge Ward's order, which authorized interception of conversations "from the premises known as the first floor of duplex Apartment J," and the Fourth Amendment, which requires that search warrants "particularly describ[e] the place to be searched."

In the district court appellants originally contended that the bugs were unlawfully placed upstairs in violation of Judge Ward's order. They have abandoned this claim in the face of overwhelming contrary evidence. They now argue that the eavesdropping tapes should have been suppressed on the ground that since noises from Williams' TV set, claimed to have been at all times upstairs, and comments claimed to have been uttered upstairs were audible on the tapes the government must have violated the eavesdropping order by installing a bug in a downstairs phone with a long extension cord that might be carried upstairs and thus pick up conversations there. Alternatively they argue that even if upstairs noises were overheard by accident the entire tapes should have been suppressed. We reject both arguments.

After extensive oral hearings, in which Williams and the agents who installed the bugs testified, Judge Owen found that there were no bugs installed upstairs, that a bug with a standard 10–15 foot range was installed downstairs in a standard beige phone, described by the installer, Officer Meyers, as having a 7–8 foot cord, and that

this installation was in compliance with Judge Ward's order. Although DEA agents, when they entered the apartment months later on May 31, 1981 (after the narcotics ring was broken by arrests), noted that the downstairs beige phone now had a 12 to 15 foot cord, this could not be attributed to the government (since the officers installed the phone on a 7 to 8 foot cord) but may have been the work of Williams, who admittedly extended the cord of one of the phones. Although Williams testified that the extension installed by him was not on the beige phone, the court stated that "the tortuous testimony of ... Williams I utterly reject as false." These findings are not clearly erroneous.

 In any event, since Judge Ward's order authorized interception of narcotics-related conversations "from" the downstairs it permitted the investigators to intercept such communications as might be audible by an unenhanced bug in the living room, even though they originated from the bedroom and could be heard downstairs because of the open stairway between the rooms.[13] Moreover, the faint television and other noises claimed (but not shown) to have emanated from the bedroom were insignificant. Judge Owen found that of nearly 200 taped conversations introduced into evidence, none appeared to have originated from upstairs, thus confirming evidence that the investigating agents took reasonable steps to limit interception to narcotics-related conversations originating in the living room downstairs. This satisfied the standard, which is that agents observe reasonable safeguards against exces-

sive intrusion. *Scott v. United States,* 436 U.S. 128, 139–43, 98 S.Ct. 1717, 1724–26, 56 L.Ed.2d 168 (1978); *United States v. Tortorello,* 480 F.2d 764, 784–85 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); see also, *United States v. Rizzo,* 491 F.2d 215, 217 n. 7 (2d Cir.), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974).

Our holding does not convert the electronic surveillance order into a general warrant in violation of the Fourth Amendment requirement that search warrants particularly describe the things to be seized. Here the order specifically authorized the interception of audible narcotics-related conversations by named individuals and some unknown within a designated area. This satisfied Fourth Amendment requirements. See *Steele v. United States,* 267 U.S. 498, 503–04, 45 S.Ct. 414, 416–17, 69 L.Ed. 757 (1925), incorporated in Title III, 18 U.S.C. §§ 2518(1)(b)(i)–(iv) and 2518(4)(a)–(e).

### 3. *Custody of the Original Tapes*

 We find equally meritless appellants' contention that in violation of Fed.R. Crim.P. 16(a)(1)(C)[14] and their constitutional rights to confrontation and due process they were denied access to the original tape recordings made from Williams' apartment. Appellants were given copies of the tapes which had been enhanced to promote audibility. In addition, the prosecutor made the original tapes available to appellants and their experts for analysis in his office. However, appellants declined this offer, seeking instead to analyze the original tapes outside the government's custody but

---

**13.** Cf. *United States v. Sellaro,* 514 F.2d 114, 124 (8th Cir.1973), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975) (order authorizing interception of communications *from* telephones encompasses authorization to intercept both incoming and outgoing calls).

The government gave the agents monitoring the wiretap at Williams' apartment instructions to intercept only conversations *in* the living room. Judge Owen ruled that the government's "overly restrictive interpretation" of the scope of the agents' authority did not bind the court in construing Judge Ward's order. Even assuming the agents were under a statutory

duty to minimize recordings of conversations beyond the scope of the authorization, the trial court found that they did so out of an excess of caution. See 18 U.S.C. § 2518(5).

**14.** Rule 16(a)(1)(C) provides:

"Upon request of the defendant the government shall permit the defendant to inspect and copy ... tangible objects ... which are within the possession, custody or control of the government, and which are material to the preparation of his defense or are intended for use by the government as evidence in chief at the trial...."

with a government agent present. In the absence of any plausible evidence indicating an alteration or distortion of what was recorded on the tapes and in light of the trial court's finding of authenticity and accuracy, the request to remove this fragile evidence from the government's custody was unwarranted. *United States v. Fuentes,* 563 F.2d 527, 532 (2d Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977).[15]

### 4. The Court's "Community Impact" Instruction

■ Over defense objection, the district court charged the jury:

"If, ladies and gentlemen, you fail to find beyond a reasonable doubt that the law has been violated as to any charge by a defendant, you should not hesitate for any reason to return a verdict of acquittal. If, on the other hand, you should find that the law has been violated as charged by a defendant in any count, *you should not hesitate* because of sympathy of other reason *to return a verdict of guilty as a clear warning that a crime of this character may not be committed with impunity. The public is entitled to be insured of this.*" (Emphasis added.)

Appellants contend that the italicized portion amounted to impermissible judicial advocacy, *Quercia v. United States,* 289 U.S. 466, 470–71, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933); *United States v. Araujo,* 539 F.2d 287, 290 (2d Cir.), *cert. denied,* 429 U.S. 983, 97 S.Ct. 498, 50 L.Ed.2d 593 (1976), diverting the jury's focus from consideration of

individual proof to questions of public policy. Cf. *United States v. Cheung Kin Ping,* 555 F.2d 1069, 1073–74 (2d Cir.1977).

Although we long ago held that the giving of a "community impact" instruction was not reversible error, *United States v. Witt,* 215 F.2d 580, 585 n. 4 (2d Cir.), *cert. denied,* 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697 (1954), we have disapproved of similar statements when made by a prosecutor as tending to divert the jury from consideration of the evidence, *United States v. Barlin,* 686 F.2d 81, 93 (2d Cir.1982). For the same reason we find no useful purpose to be served by the challenged instruction.[16] However, since the evidence in the present case was overwhelming against all defendants except Haynes, whose conviction is reversed on other grounds, and the instruction received no prominence, the error was harmless and did not deprive the defendants of a fair trial. *Barlin, supra,* 686 F.2d at 93; *United States v. Modica,* 663 F.2d 1173, 1182 (2d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); *United States v. Birnbaum,* 373 F.2d 250, 263 (2d Cir.), *cert. denied,* 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967).

### B. ADMISSION OF EVIDENCE OF DEFENDANTS' REFUSAL TO FURNISH PALM PRINTS

Four appellants (Porcelli, Guippone, Harrison and Markum) contend that the trial judge erred in admitting testimony as to their refusal to supply palm prints as evidence of consciousness of guilt without permitting them to elicit that they had refused because they first wanted advice of counsel.

---

**15.** Even if, as Guippone and Porcelli claim, their conversations relating to gambling had been omitted from the recordings played to the jury, such omissions would not impugn the integrity of the tapes that were heard by the jury, which related to narcotics. Moreover, appellants made no objection at trial that the recordings were unfairly incomplete.

**16.** The "community impact" charge cannot be equated with the "province of the jury" charge under which the jury is told:

"You are to perform this duty [to try the issues of fact] without bias or prejudice as to any party. The law does not permit jurors to be governed by sympathy, prejudice, or pub-

lic opinion. Both the accused and the public expect that you will carefully and impartially consider all the evidence in the case, follow the law as stated by the Court and reach a just verdict regardless of the consequences."

This charge has been approved by us as "standard" and proper, *United States v. Ramirez,* 482 F.2d 807, 816 (2d Cir.), *cert. denied,* 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 475 (1973). In contrast to the "community impact" instruction, it directs the jury *not* to consider public opinion. See 1 J. Devitt & C. Blackmar, *Federal Jury Practice and Instructions,* § 11.03, at 293 (3d ed. 1977).

Appellants argue that exclusion of evidence of their explanation violated the "doctrine of completeness" as reflected in Fed.R.Evid. 106[17] because the evidence was admissible as proof of their "state of mind," Fed.R. Evid. 803(3).

On two occasions the government attempted pursuant to court order to obtain palm prints from Porcelli, Guippone, Harrison, Markum, and Williams, to determine whether any of their prints matched a latent palm print found on a paper bag containing heroin which was seized on the day of their arrests. Appellants refused, stating that they would not supply prints in the absence of their lawyers. At trial the government sought to introduce the refusal as evidence of appellants' consciousness of guilt and to explain why the government's fingerprint expert had not identified the latent print after that fact had been brought out by defense counsel. Appellants objected to the admission of the evidence unless they were permitted to elicit that they had contemporaneously expressed the desire to consult counsel. The district court ruled that the latter assertions were inadmissible hearsay and unnecessary for a fair understanding of the evidence of refusal, since the government might "take prints as a matter of right[ ]," and appellants had "no legal basis of any kind to refuse prints." The court indicated that the defendants could offer their explanation by their own testimony. At the close of trial the court instructed the jury that the refusal to supply palm prints could provide evidence of the defendants' consciousness of guilt.

■ The government has a right to obtain prints pursuant to a lawful custodial arrest, see *United States v. Doe,* 457 F.2d 895, 898–99 (2d Cir.1972), *cert. denied,* 410 U.S. 941, 93 S.Ct. 1376, 35 L.Ed.2d 608 (1973), without the presence of counsel, *United States v. Ash,* 413 U.S. 300, 313, 93 S.Ct. 2568, 2575, 37 L.Ed.2d 619 (1973) (no right to counsel at post-indictment photograph display for purposes of allowing a witness to attempt an identification), and appellants' refusal to provide prints was admissible as evidence of consciousness of guilt. *United States v. Nix,* 465 F.2d 90, 93–94 (5th Cir.), *cert. denied,* 409 U.S. 1013, 93 S.Ct. 455, 34 L.Ed.2d 307 (1972).

■ Testimony regarding appellants' statements that they desired counsel would be excludable as hearsay, Fed.R.Evid. 802, unless admissible under an exception to the hearsay rule. Admission was not mandated by Fed.R.Evid. 106 (doctrine of completeness) since that rule applies only to writings, not oral statements; in any event Rule 106 does not render admissible evidence that is otherwise inadmissible. However, the evidence was admissible under the exception to the hearsay rule provided by Fed.R.Evid. 803(3),[18] since appellants' contemporaneous statements were relevant to the issue of their state of mind, i.e., whether they had a consciousness of guilt in refusing to furnish the prints or were acting in good faith.

It was therefore error to exclude the proof which appellants sought to elicit. However, the error was harmless and did not affect appellants' substantial rights in view of the overwhelming proof of their guilt. Fed.R.Crim.P. 52(a). Moreover, any prejudice was minimized by the fact that, notwithstanding the court's evidentiary ruling, defense counsel, in defiance of that ruling and despite the court's admonitions, sought by questions to convey to the jury that appellants had refused to furnish prints until they had advice of counsel.

**C. INDIVIDUAL CLAIMS OF PORCELLI AND GUIPPONE**

■ Porcelli and Guippone contend that the evidence was insufficient to support

---

17. Fed.R.Evid. 106 provides:

"When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."

18. Fed.R.Evid. 803(3) excepts from the Hearsay Rule "[a] statement of the declarant's then existing state of mind . . . ."

their convictions of substantive offenses (possession on March 6, 1981, of three-quarters of a kilogram of cocaine with intent to distribute (Count Seven) and possession of one-eighth of a kilogram on March 16, 1981 (Count Nine)). In view of the overwhelming evidence of guilt this claim is rejected. Examined in the light most favorable to the government, *Glasser v. United States, supra,* 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Stirling,* 571 F.2d 708, 734 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978), the record shows that on March 6, 1981, Porcelli and Guippone agreed in response to Williams' request for "rock" (cocaine) to send him "three-quarters" of a kilogram of "Peruvian flake" (cocaine) they had received from a friend, which had come out "like feathers" (good quality). Similarly, on March 16, 1982, Porcelli agreed with Williams to "bring down the eighth" (eighth of a kilogram). The jury was entitled from the surrounding circumstances, including Williams' expressed need for heroin on the previous day (March 15), and his statement a day later (March 17) that he had paid $30,000 for "boy" (code name for heroin) the night before, to find beyond a reasonable doubt that the substance purchased from Porcelli on March 16 was heroin. There was also ample evidence that the quantities were kilograms, not grams for personal use, and that the crimes occurred within the Southern District of New York. *United States v. Panebianco,* 543 F.2d 447, 455 (2d Cir.1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977).

Their "boilerplate claim" that the proof disclosed multiple conspiracies rather than the single conspiracy charged, see *United States v. McGrath,* 613 F.2d 361, 367 (2d Cir.1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980), must also be rejected. The trial court's charge on conspiracy followed that approved by us, *United States v. Tramunti,* 513 F.2d 1087, 1107 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). The question of multiple or single conspiracies is one of fact, *United States v. Alessi,* 638 F.2d 466, 472 (2d Cir.1980). Accepting the proof as

we must in the light most favorable to the government, *United States v. Murray,* 618 F.2d 892, 902 (2d Cir.1980); *United States v. Armedo-Sarmiento,* 545 F.2d 785, 789 (2d Cir.1976), *cert. denied,* 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977), the evidence was sufficient to permit the jury to find the existence of a single, large-scale, "chain-type" narcotics operation whose central link was Williams' apartment on East 89th Street.

Porcelli and Guippone agreed to further the aims of Williams' narcotics enterprise by supplying him with large quantities of heroin and cocaine for which they received large sums of money. They were aware of the size of the middleman Williams' operation, *United States v. Armedo-Sarmiento,* 545 F.2d at 790; *United States v. Panebianco,* 543 F.2d at 453, and knew their supply of narcotics would not stop with him. Indeed, they frequently discussed the fortunes of one of his distributors in the venture, Harrison, who was late in his payments. Thus, Porcelli and Guippone depended on Williams to collect money due them from Harrison, and Williams depended on Porcelli and Guippone to keep him in steady supply.

When Porcelli and Guippone refused to come to Williams' apartment for five weeks, suspecting danger, Williams could not obtain heroin. The three exchanged reciprocal warnings, reinforcing the existence of their interdependence and mutual assistance, thus warranting treatment of their dealings as a single business venture. *United States v. Tramunti, supra,* 513 F.2d at 1106. The temporary hiatus that occurred while the three waited for the danger to pass did not transform the single ongoing conspiracy into two conspiracies since there was nothing to indicate that any of them viewed their mutual dealings as having terminated. *United States v. Panebianco, supra,* 543 F.2d at 452. On the contrary, during the period when Porcelli and Guippone were lying low, Williams made repeated efforts, including a meeting with Porcelli, to arrange alternative meeting places to honor Porcelli and Guippone's

demand, which was not that they cease doing business together, but that they meet in the Bronx. Similarly, the record is clear that appellants Porcelli and Guippone never withdrew from the conspiracy; they merely wanted to switch its locale. Consequently, their claim that statements of co-conspirators after March 16, 1981 should have been excluded is frivolous. *United States v. Schwenoha,* 383 F.2d 395, 396–97 (2d Cir. 1967), *cert. denied,* 390 U.S. 904, 88 S.Ct. 817, 19 L.Ed.2d 869 (1968); *United States v. Borelli,* 336 F.2d 376, 388–89 (2d Cir.1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).

■ We also reject as meritless Porcelli's contention that Judge Owen erred in ruling that he would, if Porcelli took the stand, admit Porcelli's 20-year old narcotics conviction on the issue of intent and guilty knowledge, Fed.R.Evid. 404(b). The ruling was correct in view of the claim of Porcelli's counsel in his opening statement that the telephone conversations with Williams related to gambling, not narcotics, and Porcelli's refusal to remove this issue from dispute by stipulating that the terms used in the taped conversations referred to narcotics. *United States v. Reed,* 639 F.2d 896, 906–07 (2d Cir.1981); *United States v. Figueroa,* 618 F.2d 934, 941–43 (2d Cir.1980); *United States v. Mohel,* 604 F.2d 748, 753–55 (2d Cir.1979).

Porcelli and Guippone's remaining contentions are without merit. We therefore affirm their convictions.

## D. *HARRISON'S CLAIMS*

■ Harrison contends that he was deprived of a fair trial because of prosecutorial misconduct. His first claim is that when Agent Hubert Shockley hesitated in making an in-court identification of him as

the person seen entering Williams' apartment on March 15, 1981, to arrange delivery of two kilograms of cocaine, the prosecutor aided Shockley by using his eyes to point toward Harrison at the counsel table. Both the prosecutor and Shockley denied any such improper collaboration. Moreover, the court found first that any hesitation in making the identification was attributable to the fact that Harrison's face was blocked from the witness by his counsel's open briefcase. Second, the court found that any change in the prosecutor's facial expression was caused by his astonishment when, just as the witness was looking for Harrison, defendant Haynes inexplicably rose to his feet, directing attention away from Harrison to himself. Since the question of what occurred in the courtroom in the presence of judge and jury is one of fact, we fail to find sufficient support, in view of the trial judge's comments, for the misconduct claim. In any event, there was abundant other independent evidence that Harrison was the speaker in the March 15 conversation with Williams regarding the delivery of cocaine.[19] Under the circumstances we also reject the claim that the trial judge abused his discretion in ordering Harrison after the incident to give a voice exemplar.

■ Nor is there any merit in the claim that the prosecutor acted improperly in questioning on cross-examination Harrison's "voice expert" witness, Louis Gerstman, regarding prior occasions when his testimony in other cases had been criticized by the court as unworthy of belief. Proof that a judge of the District of Columbia Superior Court before whom Gerstman had testified as an expert had found that Gerstman had "guessed under oath" was probative of the weight to be accorded to his testimony. Fed.R.Evid. 608(b), 613(a).[20]

19. This evidence included testimony of another government agent who had spoken to Harrison on the day of his arrest and identified the voice in the March 15 conversation as that of Harrison. Harrison also admitted that he was known as "Harry," the name by which he was addressed by Williams at their March 15 meeting.

20. Fed.R.Evid. 608(b) provides in relevant part:

"Specific instances of the conduct of a witness, for the purpose of attacking ... his credibility, ... may ... in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness...."
Fed.R.Evid. 613(a) provides:

Harrison's claim that the court erred in admitting identification testimony by Frank Lucas, a thrice convicted narcotics dealer, borders on the frivolous. The evidence was relevant to establish Harrison's residence, a material fact, and to identify his voice on the March 15, 1981 tape after Harrison had refused to stipulate that he was the speaker whom Williams greeted as "Harry." Lucas' allegedly prejudicial testimony regarding his own sordid history was elicited by Harrison's own counsel, over the government's objection. Harrison thus waived any possible claims based on the prosecutor's reference to the testimony in summation by his failure to object. *United States v. Clemente,* 640 F.2d 1069, 1081 (2d Cir.1981), *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981).

We find no merit in Harrison's other contentions. His conviction accordingly is affirmed.

### E. *MARKUM'S CLAIMS*

Markum claims that the testimony of the government witness Frank Lucas regarding Lucas' own narcotics history and attempts to bribe state court judges, which was adduced on cross-examination by Harrison's counsel over government objection, should have been excluded under Fed. R.Evid. 403 on the ground that its prejudicial impact outweighed its probative value, or that a limiting instruction as to Markum should have been given under Fed.R.Evid. 105, or a severance granted under Fed.R. Crim.P. 14. The claim is meritless. Lucas' testimony linked Harrison to the conspiracy. A limiting instruction was unnecessary since the impeaching testimony brought out on cross-examination related exclusively to Lucas and could not possibly have been attributed by the jury to Markum or any other defendant. Moreover, any possible error would have been harmless beyond a reasonable doubt in view of the abundant independent evidence of Markum's guilt, particularly his frequent and highly incriminating conversations with Williams about narcotics.

We also reject Markum's claim that the trial judge erred in considering Markum's perjured testimony in imposing sentence. *United States v. Grayson,* 438 U.S. 41, 50–51, 98 S.Ct. 2610, 2615–16, 57 L.Ed.2d 582 (1978). His conviction is accordingly affirmed.

### F. *NALVEN'S CLAIMS*

Relying mainly on *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981), Nalven claims that the court erred in admitting a false exculpatory statement made by him upon his arrest. He asserts that the interrogation violated his Sixth Amendment right to counsel.

DEA agents, after arresting Nalven, read him his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and asked him whether he wished to waive them, to which he replied that he did not. He did not request a lawyer. Some 40 minutes later, at DEA headquarters, an Assistant U.S. Attorney again read to Nalven his *Miranda* rights and asked him if he had ever taken drugs. He replied that he had not. When further interrogation was attempted he responded that he would have nothing to say until he spoke with an attorney, whereupon questioning ceased. At trial, in rebuttal to Nalven's testimony that he bought small amounts of cocaine as a recreational user of cocaine, not a co-conspirator, *United States v. Swiderski,* 548 F.2d 445, 450 (2d Cir.1977), the government sought to impeach him by introducing his earlier answer. The trial court concluded that in giving this answer Nalven knowingly waived his rights until he decided not to talk further before consulting counsel. We agree.

*Edwards v. Arizona, supra,* held only that it was impermissible to infer a waiver by an accused of his Sixth Amend-

"In examining a witness concerning a prior statement made by him, ... the statement need not be shown nor its contents disclosed to him at that time, but on request the same shall be shown or disclosed to opposing counsel."

ment right to counsel after he "has clearly asserted his right to counsel," 451 U.S. at 485, 101 S.Ct. at 1885. Further interrogation would then be inconsistent with *Miranda.* However, unless and until the accused asks for a lawyer he may waive his procedural *Miranda* rights, see *Michigan v. Mosley,* 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 326 n. 10, 46 L.Ed.2d 313 (1975); *id.* at 109–11, 96 S.Ct. at 329–30 (White, J., concurring). Prior to the accrual of the right to counsel, the standard for waiver is whether under the facts and circumstances of the case, including the accused's background and conduct, he understands the right in question and voluntarily intends to relinquish it. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

 In the hearing as to the voluntariness of Nalven's statement, Nalven acknowledged that when he was read his rights by the Assistant United States Attorney he understood each one of them. He understood that he did not have to answer any questions, that anything he said could be used against him, and that he had a right to have an attorney before proceeding any further. Nalven confirmed, too, that he had acknowledged understanding those rights at the time he was advised of them. Since Nalven's rights were scrupulously respected at every stage, with interrogation terminated immediately upon his stating that he wanted to consult a lawyer, and there is no suggestion that he was subjected to lengthy questioning or other improper tactics, the finding of a waiver with respect to his statement concerning his use of narcotics must be upheld. *Michigan v. Mosley, supra,* 423 U.S. at 105–06, 96 S.Ct. at 327.

 In any event, even if the admission of the false exculpatory statement had been error it would have been harmless beyond a reasonable doubt, since the statement formed but a minuscule part of the evidence against Nalven, which included repeated purchases of substantial amounts of cocaine from Williams, statements referring to Nalven's role as a tester and money launderer, and direct evidence of his assistance to Williams in the use of the microscope to examine cocaine.

Nalven also claims that the trial judge erred in admitting into evidence his licensed gun, a Walther PPK 9 millimeter pistol, and 300 rounds of hollowed out "dum-dum" bullets seized from his basement office at the time of his arrest. We disagree.

 The trial court's determination that the probative value of admission of a weapon outweighs the danger of unfair prejudice will be upheld unless arbitrary or irrational. *United States v. Robinson,* 560 F.2d 507, 514–15 (2d Cir.1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). The government charged that Nalven let his bar be used for substantial narcotics transactions. Before the admission of the weapon, DEA agents testified that the bar was the site of their initial heroin purchase from Steward, that the agent was told then that the bar was "safe" and that the back room could be used to count money and check the "dope," and that the bar was later used by Nalven to test drugs for Williams. That the gun and ammunition were found in the basement rather than in the bar could have supported the conclusion that Nalven intended their use for protection, not of his bar, but of other business. While the possession of a licensed gun, standing alone, might have no relevance to illegal narcotics business, here the location of the weapon and the special type of ammunition found with it (deadly hollowed out "dum-dum" bullets) supported the inference that these were instruments of the narcotics trade. See *United States v. Wiener,* 534 F.2d 15, 18 (2d Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976).

Under the circumstances we cannot say that the trial judge's determination was irrational. Moreover, since the jury was aware that Nalven had a license for the gun there was less danger that jurors would be tempted to punish him for possession of the gun rather than for the offense charged. See *Robinson,* 560 F.2d at 513–14.

## G. *TERRY'S CLAIMS*

 Terry prudently does not question the sufficiency of the overwhelming evi-

dence of his guilt. However, he does claim that the trial court erred in failing to suppress the set of scales (of the type used to weigh narcotics being cut or packaged), some marijuana, and a business card, all of which were seized from his apartment during the execution of a warrant for his arrest. Terry argues that the police lacked sufficient reason to believe that he was at home, and therefore they could not lawfully enter his apartment. *Payton v. New York,* 445 U.S. 573, 602–03, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980). Because those items formed part of the basis for the subsequent issuance of a warrant for the search of his apartment, which uncovered other incriminating evidence, he contends that the search warrant was tainted. Terry also claims that the police extended their stay beyond the time necessary to secure the premises and that the seizure of the business card, which occurred some 15–20 minutes after the agents' arrival on the premises, was invalid. We disagree.

Armed with a valid arrest warrant, the agents had the right to enter the Terry apartment if they had a reasonable basis for believing Terry was there. *Payton v. New York,* 445 U.S. at 602–03, 100 S.Ct. at 1388; *United States v. Spencer,* 684 F.2d 220, 222–23 (2d Cir.1982). They had sufficient information to justify their belief in Terry's presence. The telephone at the apartment was listed to Doris Terry. A man named Terry had spoken to Williams from that apartment. When the agents arrived at the apartment building, a 12-year old boy wearing a shirt with the name "Terry" on it told them his father and mother lived in the apartment and did not indicate that his father was not at home. Moreover, the agents arrived at the apartment at 8:45 A.M. on a Sunday morning, a time when they could reasonably believe that Terry would be home. We have rejected the contention that the police must first conduct a thorough investigation to obtain evidence of an arrestee's actual presence before entering his residence. *United States v. Manley,* 632 F.2d 978, 984 (2d Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981).

Once lawfully in the apartment the agents were entitled to make a limited security check of the premises, *id.,* 632 F.2d at 986; *United States v. Gomez,* 633 F.2d 999, 1008 (2d Cir.1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981). The crucial incriminating items—the scale, marijuana, and business card—were lawfully seized during the check because they were within the officers' plain view. *Washington v. Chrisman,* 455 U.S. 1, 5–6, 102 S.Ct. 812, 815–16, 70 L.Ed.2d 778 (1982); *Spencer, supra,* 684 F.2d at 224. As long as agents did not enter because they had advance knowledge of these items, their discovery was inadvertent. See *United States v. Liberti,* 616 F.2d 34, 37 (2d Cir.), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980). Terry argues that the scale could not have been in plain view because the DEA agent who seized it had to walk over to the box and look into it before determining that the box contained a scale. However, since the outside of the box itself, which was in plain view, bore the name "OHAUS," the name of a balance scale frequently used in narcotics dealing, and the open box revealed part of the scale with white powder residue on it, the agent's seizure of it was lawful. See *United States v. Mannino,* 635 F.2d 110, 115 (2d Cir.1980).

After the initial pass-through of the apartment, and the discovery of the marijuana and scale, the agents were entitled to remain on the premises to secure the apartment from the destruction of evidence, *United States v. Manley,* 632 F.2d at 987, and to request the assistance of Terry's wife in locating him. The plain view seizure of the business card, which occurred during this period, was thus lawful. Accordingly Terry's conviction is affirmed.

## H. *INSUFFICIENCY OF THE EVIDENCE AGAINST HAYNES*

Haynes claims that since there was insufficient proof of his participation in the alleged conspiracy the trial court erred in admitting against him Williams' out-of-court hearsay statements and that the non-

hearsay evidence against him was insufficient to permit the jury to find him guilty of conspiracy or of the substantive charges against him. We agree.[21]

■ Before a jury may consider against a defendant a conspiracy count that rests in part on hearsay statements of an alleged co-conspirator, the trial judge must be satisfied by a fair preponderance of the independent non-hearsay evidence that the defendant was in fact a member of the conspiracy. *United States v. Cicale,* 691 F.2d 95, 103 (2d Cir.1982); *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). Without the requirement of independent non-hearsay corroboration, co-conspirator hearsay "would lift itself by its own bootstraps to the level of competent evidence," *Glasser v. United States,* 315 U.S. 60, 74–75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942), and thus assume the conclusion to be proven, in this case Haynes' membership in the conspiracy.

■ The standard for independent proof of participation in the conspiracy is not as high as that needed to submit a charge of conspiracy to the jury, *United States v. Alvarez-Porras,* 643 F.2d 54, 57 (2d Cir.), *cert. denied,* 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981). The proof may be "totally circumstantial," *United States v. Ragland,* 375 F.2d 471, 477 (2d Cir.1967), *cert. denied,* 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968), and the court must view the evidence as a whole rather than consider individual items in isolation, *United States v. Di Palermo,* 606 F.2d 17, 22 (2d Cir.1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980). Once a

conspiracy has been proved to exist, the evidence needed "to link another defendant with it need not be overwhelming." *United States v. Provenzano,* 615 F.2d 37, 45 (2d Cir.), *cert. denied,* 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980) (quoting *United States v. Head,* 546 F.2d 6, 9–10 (2d Cir. 1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977)).

■ Notwithstanding this lower standard the government must nonetheless show a "likelihood of an *illicit* association between the declarant and the defendant." *United States v. Ragland, supra,* 375 F.2d at 477 (emphasis added). Mere familiarity with a drug dealer does not make one a member of his conspiracy; nor does association with a conspirator provide a sufficient basis for the admissibility of hearsay statements of an alleged co-conspirator. *United States v. Steinberg,* 525 F.2d 1126, 1134 (2d Cir.1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); *United States v. Fantuzzi,* 463 F.2d 683, 690 (2d Cir.1972); *United States v. Ragland, supra,* 375 F.2d at 477.

■ In the present case the independent non-hearsay proof consisted of (1) Haynes' admission that he was known as "Legs" and knew Williams and Harrison, (2) proof of a telephone conversation with Williams on April 9, 1981, and (3) proof that on April 25, 1981, Williams dialed a telephone number at Haynes' apartment house.[22] The government argues that the short April 9th conversation, in which the portion relied on by it was Haynes' question "what's happening Felix" and Williams' reply "ain't nothing happening Legs," was sufficient to meet

---

**21.** Since we find this issue dispositive it is unnecessary for us to consider Haynes' other claims, e.g., that he was denied a fair trial by reason of the prosecutor's improper comments, or to remand for correction of his sentence which the government concedes to be improper by reason of the unauthorized imposition of a lifetime parole. *Bifulco v. United States,* 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980).

**22.** Scraps of paper retrieved from Williams' trash and Williams' notebook containing references to "Legs" are hearsay and accordingly may not be used to meet the *Geaney* threshold.

The government understandably did not seek to admit these writings as business record exceptions to the hearsay rule, Fed.R.Evid. 803(6), absent proof of their reliability and accuracy as business records, either through a custodian or other qualified witness subject to cross-examination. *See United States v. McGrath,* 613 F.2d 361, 367–68 (2d Cir.1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980); *United States v. Baxter,* 492 F.2d 150, 164 (9th Cir.1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974).

the foregoing standards because one can infer that it was narcotics-related when considered with evidence that Williams was at that time out of drugs. We disagree.

Viewed in a light most favorable to the government and "not in isolation but in conjunction," *United States v. Geaney, supra*, 417 F.2d at 1121, the independent non-hearsay evidence proves only an acquaintanceship, not the likelihood of an illicit relationship between Williams and Haynes. The expression "what's happening?" is a widespread innocent salutation, the equivalent to "what's cooking?," "what's new with you?," or simply "hello, how are you doing?" Hearsay proof that co-conspirators may on two or three occasions have used the same phrase in the course of conversations with Williams involving narcotics hardly supports the sinister inference demanded by the government, in view of common knowledge that the salutation is widely used by innocent acquaintances. While "[j]udges are not required to exhibit a naiveté from which ordinary citizens are free," *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir.1977), neither are we permitted to read evil meaning into words usually having an innocent connotation, absent proof (of which there is none here) that they were part of a secret code.

 Statements made by Williams on April 25, 1981, when he dialed a number at Haynes' apartment house, were hearsay as to Haynes since only Williams' voice was recorded and there is no non-hearsay proof that Haynes was the person on the other end of the line. However, even if, as the government argues, the Williams' end of the conversation was admissible not to prove the truth of what he said but merely for the purpose of showing that the statement was made, Williams' statements that "you can send Bobby" and "[i]f Gabe come, tell him something about shirts that he had passed," are too ambiguous to cross the threshold required to establish participation in a criminal conspiracy, *United States v.*

*Cianchetti*, 315 F.2d 584, 587–88 (2d Cir. 1963). When evidence used to satisfy *Geaney* is "as consistent with innocence as with guilt," additional evidence linking the defendant to the conspiracy assumes "pivotal importance." *Alvarez-Porras, supra*, 643 F.2d at 57–58. Here, that all-important other evidence is totally lacking. The most that was developed by the evidence was an acquaintanceship between Haynes and Williams plus a *possible* inquiry by the former of the latter about narcotics. As against this meagre evidence the record shows that in the course of eight months of surveillance by trained agents, Haynes was never seen at Williams' apartment. His voice was heard on only one of some 200 taped conversations between Williams and his co-conspirators that were admitted into evidence.

 For these reasons the jury should not have been permitted to consider the statements of co-conspirators concerning Haynes and the charges against him should have been dismissed for insufficiency of proof. Accordingly, we reverse his conviction and remand with directions to enter a judgment of acquittal of the charges against him.[23]

\* \* \*

We have considered the remaining claims made by various appellants and find them to be without merit.

The judgment convicting appellant Haynes is reversed. The judgments convicting all other appellants are affirmed.

---

**23.** Haynes' conviction under 21 U.S.C. § 843(b) for using a telephone to further the conspiracy must be reversed in light of our ruling that the evidence is insufficient to convict Haynes of the predicate felony of membership in the conspiracy.