**CORRECTED OPINION**

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DAVID JOHNSON; ROBERT W.
JOHNSON, IV, by and through his
guardian ad litem Michelle Johnson;
NICOLE WILSON, by and through her
guardian ad litem Vicki Woodward;
AMANDA VICKERS, by and through
her guardian ad litem Donna
Vickers; DAVID CLARKE,
Plaintiffs-Appellees,

v.

CITY OF AIKEN; TRUXTON UMSTEAD,
individually as Public Safety Officer
with the City of Aiken; C. W.
CLARK, individually as Public Safety          No. 98-2611
Officer with the City of Aiken,
Defendants-Appellants,

and

RODNEY MILLS, individually as
Public Safety Officer with the City
of Aiken; CRAIG BURGESS,
individually as Public Safety Officer
with the City of Aiken; H. V.
MORRISON, individually as Public
Safety Officer with the City of
Aiken; MIKE DURELL, individually as
Public Safety Officer with the City
of Aiken; BOB BESLEY, individually

_____

CHANGES MADE ON PAGES 5 AND 17

_____

as Public Safety Officer with the
City of Aiken; KARL ODENTHAL,
individually as Public Safety Officer
with the City of Aiken; JODY
ROWLAND, individually as a deputy

with the Aiken County Sheriff's
Department; J. C. BUSBEE,
individually as Public Safety Officer
with the City of Aiken,
Defendants.

Appeal from the United States District Court
for the District of South Carolina, at Aiken.
Solomon Blatt, Jr., Senior District Judge;
Julian Abele Cook, Jr., Senior District Judge,
sitting by designation.
(CA-96-3141-1-8)

Argued: December 2, 1999

Decided: March 9, 2000

Corrected Opinion filed: April 14, 2000

Before WILKINSON, Chief Judge, and WILKINS and
LUTTIG, Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded by unpublished opin-
ion. Judge Wilkins wrote the opinion, in which Chief Judge Wilkin-
son and Judge Luttig joined.

_____

**COUNSEL**

**ARGUED:** Andrew Frederick Lindemann, DAVIDSON, MORRI-
SON & LINDEMANN, P.A., Columbia, South Carolina, for Appel-

lants. J. Christopher Mills, FAIREY, PARISE & MILLS, P.A., Columbia, South Carolina, for Appellees. **ON BRIEF:** David L. Morrison, Christine E.W. Edenfield, DAVIDSON, MORRISON & LINDEMANN, P.A., Columbia, South Carolina, for Appellants. W. Gaston Fairey, FAIREY, PARISE & MILLS, P.A., Columbia, South Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

WILKINS, Circuit Judge:

The City of Aiken and Officers C. W. Clark and Truxton Umstead of the Aiken Department of Public Safety (collectively, "Appellants") appeal a jury verdict against them in a civil suit arising out of the execution of a search warrant on a residence in which several juveniles (collectively, "Appellees") were present.[1] See 42 U.S.C.A. § 1983 (West Supp. 1999). We affirm in part, reverse in part, and remand.

I.

A.

The events underlying this suit[2] began Sunday morning, October 8,

---

[1] This action was brought by David Johnson; Robert W. Johnson, IV, by and through his guardian ad litem Michelle Johnson; Nicole Wilson, by and through her guardian ad litem Vicki Woodward; Amanda Vickers, by and through her guardian ad litem Donna Vickers; and David Clarke.

[2] In ruling on a motion for judgment as a matter of law, the district court must view the evidence in the light most favorable to the nonmovants and draw all reasonable inferences in their favor without weighing the evidence or assessing the witnesses' credibility, and we must do the same on appeal. See Townley v. Norfolk & W. Ry. , 887 F.2d 498, 499 (4th Cir. 1989). The facts set forth in the text are those viewed in the light most favorable to Appellees, and relevant conflicts in the evidence are identified in the accompanying footnotes.

3

1995, when Aiken County Sheriff's Department (Sheriff's Department) personnel discovered Jennifer Hamlet--a 14-year-old runaway --in a motel room in the City of Aiken with her boyfriend--18-year-old Josh Smith--and 15-year-old William Rogers. The three were taken into custody, although they were informed that they would not be charged with any crime. They were interrogated separately by Alecia Bodie, a high school resource officer responsible for investigating juvenile offenses and child abuse. Between noon and 1:30 p.m., they provided the following written statements concerning what they had observed at the home of Rodney Bryant, with whom Hamlet had stayed Friday night:

Rogers:

On the date of Saturday October 7 Josh Smith, Jennifer Hamlet, and I went to an apartment. The apartment was on Stone Dr. in Aiken. We knew that the South Side Crypts were there and we prepared ourselves for the worst. Upon arriving Josh and Jennifer went inside. I sat in the truck in case something went wrong. After about 15 to 20 minutes I walked in. I saw a room full of teenage guys sitting around watching T.V. One of the guys was drinking a bottle of clear liquor. I asked where Josh was at. He was in the first bedroom on the right. He [was] talking to Josh Curles. Soon after we walked back out the door and left.

Smith:

I took Jennifer to a house on Stone Dr. and when I went in a [sic] could smell pot and saw two guns on the table in front of the couch. The gang in the house is known as South Side Crypts. I took Jennifer there to get her stuff because she stayed there Friday night.

4

Hamlet:

> The house I stayed in on Friday night on Stone St. was filled with drugs and weapons. Rodney Bryant is selling cocaine and pot. People are in and out all the time. A lot of underage people are always there drinking and smoking. In the living room under the cushions there are weapons and inside of one of the cushions on the loveseat there is a lot of pot. There are guns underneath both beds. In Rodney's closet there is a rifle and on one of the shelfs [sic] in the closet there is[sic] a couple of big bags of cocaine hidden underneath some clothes.

J.A. 1656-58. The three also either drew or assisted in drawing diagrams of the layout of the house they described.

The Sheriff's Department subsequently turned the matter over to the Aiken Department of Public Safety (Department) for jurisdictional reasons. Officer Clark came to the Sheriff's Department, where he was shown the statements and informed that they had been given independently of one another. Clark proceeded to interview the three informants separately. Afterwards, Bodie discussed with Clark the responses he received from the informants and advised him they were consistent with their prior written and oral statements.

Clark interviewed Hamlet in the presence of her father. When Clark asked Hamlet what she was doing in Bryant's closet that gave her an opportunity to see the cocaine, she responded that she was looking for a clean shirt to wear. Officer Clark noticed that she was wearing a clean shirt that was "too big for her." J.A. 507. When asked how she could recognize the appearance of marijuana, she said she had used marijuana in the past. She also stated that she had seen people playing with handguns in the living room of the Stone Drive residence while she was there. Finally, Hamlet told Clark that on Friday night she had personally observed Bryant sell a quantity of white powder to an unknown individual.

Clark did not know how Hamlet knew Bryant; Clark had no prior experiences with Hamlet, Rogers, or Smith; and he did not know

5

whether Hamlet, Rogers, or Smith had juvenile records. He did not know the basis for Rogers' and Smith's claims that the residence was home to a gang known as the "South Side Crypts," and the only information Clark possessed regarding the South Side Crypts was a rumor he had heard that they had been involved in a drive-by shooting.

After interviewing Hamlet, Clark informed Hamlet's father that in order to obtain a search warrant for Bryant's house, he would need to use Hamlet's name in the affidavit and that if Hamlet's father did not want his daughter's name used, Clark would not seek a warrant. Hamlet's father agreed to the use of his daughter's name. Clark then drove by the residence in order to be able to identify it in the search warrant. He subsequently sought and obtained a warrant.

Clark requested the Department Special Response Team (SRT) to execute the warrant. The SRT is a unit of specially trained officers who are utilized in part to make "dynamic" entries into buildings.[3] Clark provided Umstead, the SRT leader, with the information the informants had given him. Umstead was specifically told to expect to find numerous juveniles in the home. Clark also advised J. Carrol Busbee, Sr., Department Chief of Police, that the Department intended to utilize the SRT, and Busbee authorized Clark's plan.

The SRT officers knew that the front door of the home opened into the living room, where they expected to find those inside the residence. Entry into the dwelling would be accomplished without knocking and announcing their presence; the officers would open the front door of the house and toss in and detonate a "distraction device" in the living room before immediately entering the home.[4] The SRT intended to use the device to distract those inside the house so that the SRT could enter the home more safely. SRT officers would wear gray

_____

[3] The team consisted of Umstead and Officers Karl Odenthal; Robert W. Besley, Jr.; Mike Durell; Howard Vinnie Morrison; Rodney Mills; and Craig S. Burgess.

[4] The distraction device employed was a steel cylinder approximately four inches long with venting holes in the top. The device is rolled into the area to be secured, where upon detonation it creates an explosion of approximately 175 decibels accompanied by a bright flash of light. The device is designed to explode two or three seconds after it is released.

6

uniforms, black boots, black "ski mask type" hoods, helmets, goggles, and dark gloves. J.A. 551. They would be armed with submachine guns and semiautomatic pistols.

B.

Rodney Bryant, age 18 at the time, and Jermaine Moore, a minor, lived in the Stone Drive residence, which was located just behind their parents' home. In the early afternoon of October 8, Nicole Wilson and two friends, Amanda Vickers and David Clarke, all of whom were 15, set out for Bryant's house to pick up a videotape that Vickers' mother had lent Bryant. They stopped at a gas station on the way, where they ran into Robert W. Johnson, IV, also 15, and his older brother David Johnson, age 17. All of the youths decided to visit the house together. The five Appellees knew Bryant and Moore from school.

Bryant was not home when Appellees arrived, but Moore was. The group talked for 10 to 20 minutes, and then several of them decided to go to a nearby restaurant to purchase some take-out food. When they returned, David Johnson made red Kool-Aid fruit punch and set the pitcher on the kitchen counter. When Johnson finished mixing the Kool-Aid, only the pitcher containing the beverage and the sugar were on the counter. At the time of the raid, Appellees were watching a movie on television, talking, and eating. Besides Appellees, Moore and three other people were in the house. Vickers' and David Johnson's vehicles were parked in front of the residence.

C.

When the SRT arrived at the Stone Drive residence at 5:30 p.m., the door was open slightly; Umstead pushed it open further to survey the living room. He saw some teenagers sitting around watching television, at which time the distraction device was tossed into the living room. Vickers, who was sitting cross-legged on the floor, turned when she heard the door open and saw "a head pop[ ] in, a black head," and then saw an object fly in. J.A. 252. It bounced off a wall and detonated immediately beside her. The officers quickly entered the residence armed with submachine guns, handguns, and other weapons.

7

Appellees were shocked by the detonation of the distraction device. Vickers jumped up and then fell to the floor, crying hysterically. When she tried to get up, she was forced back to the floor by an officer. Wilson, frightened and believing that she and her friends were under attack, ran toward the back door, but was forced down and her hands were cuffed behind her back. David Johnson was quickly put on his back. Robert Johnson stood up after the blast, terrified that the armed men storming the room intended to kill him. The officers quickly pushed him to the ground. David Clarke ran to the back door and tried to open it, but the officers pushed him up against the door. The officers never identified themselves as law enforcement officers prior to gaining physical control of all of those in the house.[5]

After the SRT had secured the premises, several law enforcement officers entered the house. They proceeded to search for drugs and weapons, but found only a small quantity of marijuana in the back bedroom, a homemade smoking device, and a broken BB pistol. The officers found a number of liquor bottles, some of which were empty, in the pantry.[6] Clark seized several cups of Kool-Aid, a cup of clear liquid from the living room, and the pitcher of Kool-Aid from the kitchen. None of the beverages smelled of alcohol. Nevertheless, Chief Deputy Jody Rowland of the Sheriff's Department, who had six years experience with the South Carolina Alcoholic Beverages Commission working in the area of underage drinking, knew that the red Kool-Aid resembled a drink commonly used as a mixer by juveniles engaging in underage drinking and that punch-like drinks often mask the smell of the alcohol that underage drinkers mix with them. After Clark sought counsel from Rowland, Appellees were arrested for

_____

[5] Umstead testified that he "shouted `police'" before the distraction device was tossed into the home, J.A. 1089, and Morrison, Besley, and Burgess testified that they identified themselves as police as they entered the residence. None of the Appellees heard any such identification, however, including Robert Johnson, who was "right at the door" when the raid took place. J.A. 384.

[6] Clark and Chief Deputy Jody Rowland of the Sheriff's Department testified that they found a pint-sized gin bottle on the kitchen counter with one teaspoon of clear liquid in it. Rowland also testified that there were other liquor bottles on the counter. Appellees, however, all testified that there were no bottles on the counter prior to the raid.

being minors in possession of alcoholic liquors. <u>See</u> S.C. Code Ann. § 20-7-380 (Law. Co-op. Supp. 1995) (repealed 1996). Subsequent testing on the liquids revealed that they contained no alcohol, and the charges were dismissed.

Clark also entered and searched David Johnson's and Vickers' vehicles without their consent. David Johnson's mobile telephone and the face of his tape deck were removed from his vehicle and later returned to him.

As a result of the raid, Wilson experienced a constant, loud ringing in her ears that gradually dissipated after a few months, although loud noises or sudden movements continued to cause her anxiety at the time of trial in February 1998. Additionally, as a result of the explosion and being pushed to the ground, she scraped her chin and suffered several bruises. Vickers suffered significant pain and hearing loss as a result of the explosion, as well as bruises and burns on her left leg, and hair was burned off of her left arm. She was unable to hear out of one ear for three weeks and continued to have terrible pain in that ear. Although her condition had improved by the time of trial, she continued to experience ear pain when she became congested. She also suffered extreme nervousness after the incident and had expressed anxiety concerning leaving her house alone. After the raid, and up through the time of trial, Robert Johnson felt uncomfortable in closed areas. David Clarke's ears rang for three days after the explosion.

D.

Appellees subsequently filed this suit raising numerous challenges to the conduct of the search. In particular, the complaint alleged that the law enforcement officers violated Appellees' Fourth Amendment rights by detaining them during the search ("the detention claim"); by failing to knock and announce their presence before entering the home, detonating the distraction device, using abusive language, and pointing their weapons at Appellees ("the unreasonable search claim"); and by arresting Appellees without probable cause ("the unreasonable seizure claim"). The complaint further alleged that the City of Aiken had violated Appellees' rights by maintaining a custom or policy that allowed unconstitutional searches. Additionally, the

9

complaint articulated state law claims against the City of Aiken for assault and false arrest. Vickers and Robert Johnson also claimed that the officers had violated their Fourth Amendment rights by searching their vehicles without probable cause. In addition to compensatory and punitive damages, Appellees sought attorneys' fees pursuant to 42 U.S.C.A. § 1988(b) (West Supp. 1999) as well as an award of costs. The officers and the City generally denied Appellees' allegations and additionally asserted, inter alia, that they were entitled to qualified immunity and that their actions were objectively reasonable in light of the existing law.

The district court granted partial summary judgment to the officers on the detention claim, holding that they were entitled to qualified immunity regarding the decision to detain Appellees because in 1995 the law was not clearly established that the officers could not detain the occupants of the residence while they executed the warrant. The court, however, allowed this claim to go forward on the issue of whether the officers exceeded the scope of the legal detention of Appellees. The court also granted partial summary judgment to the officers on the unreasonable search claim for conduct relating to handcuffing and other detention activities that occurred after the SRT had entered the home.

The matter then proceeded to a jury trial. Following the conclusion of their case, Appellees waived the state law claim for false arrest and the district court granted judgment as a matter of law against Appellees on the detention claim. The district court also granted judgment as a matter of law against Appellees on their claim that the City maintained a custom that allowed unconstitutional searches, but denied judgment as a matter of law against Appellees on their claim that the City maintained a policy that allowed unconstitutional searches. The court denied the officers and the City's motion for judgment as a matter of law with regard to the other claims. Following the presentation of the officers and the City's evidence, the case was sent to the jury on the remaining claims.

In a special verdict form, the jury found that the officers had not had an objectively reasonable belief (1) in the reliability of the informants upon whom they relied in making the decision to use a dynamic entry into the home or (2) that exigent circumstances existed

10

prior to the execution of the search warrant. Regarding the unreasonable search claim, the jury found against Clark and Umstead and awarded compensatory damages in the following amounts: David Johnson, $30,000; Robert Johnson, $40,000; Wilson, $50,000; Clarke, $30,000; and Vickers, $60,000. The jury also awarded $35,000 in punitive damages to each Appellee from Clark, and $1,500 in punitive damages to each Appellee from Umstead. Regarding the unreasonable seizure claim, the jury found against Clark and awarded $1,000 compensatory damages and $5,000 punitive damages to each Appellee. As for the claim for unlawful vehicle searches, the jury found against Clark and awarded David Johnson and Vickers 35 cents each in nominal damages. The jury found in favor of the City of Aiken on the unconstitutional policy claim but against the City on the state law assault claim, awarding each Appellee $50,000 in compensatory damages.

Following the announcement of the verdict, Appellants each moved for judgment as a matter of law and for a new trial or new trial nisi remittitur. The court denied these motions. The court subsequently awarded $74,018.50 in attorneys' fees and $7,976.11 in costs.

II.

Clark and Umstead contend that the district court erred in denying their motion for judgment as a matter of law on the unreasonable search claim because they were entitled to qualified immunity. We agree.

A.

Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." E.g., Harlow v. Fitzgerald , 457 U.S. 800, 818 (1982); see Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998) (en banc), aff'd, 119 S. Ct. 1692 (1999). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). It protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable

11

only "for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). In analyzing an appeal from the rejection of a qualified immunity defense, we first must determine whether Appellees have "alleged the deprivation of an actual constitutional right at all." Wilson v. Layne, 119 S. Ct. 1692, 1697 (1999) (internal quotation marks omitted). If they have, we must then consider whether, at the time of the claimed violation, that right was clearly established, see id., and "`whether a reasonable person in the official's position would have known that his conduct would violate that right,'" Taylor v. Waters, 81 F.3d 429, 433 (4th Cir. 1996) (quoting Gordon v. Kidd, 971 F.2d 1087, 1093 (4th Cir. 1992)).

Although the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest. See Anderson v. Creighton, 483 U.S. 635, 640 (1987); Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992) (explaining that "[t]he fact that an exact right allegedly violated has not earlier been specifically recognized by any court does not prevent a determination that it was nevertheless `clearly established' for qualified immunity purposes" and that "`[c]learly established' in this context includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked"). The law is clearly established such that an officer's conduct transgresses a bright line when the law has been authoritatively decided by cases of controlling authority in the relevant jurisdiction or when "a consensus of cases of persuasive authority" otherwise necessitates "that a reasonable officer could not have believed that his actions were lawful." Wilson, 119 S. Ct. at 1700. Alternatively, the law is clearly established if it is "obvious from the general principles of the [right at issue] that the conduct of the officers" violated that right. Id. We review de novo the denial by the district court of a motion for judgment as a matter of law on the basis of qualified immunity, viewing the evidence in the light most favorable to the nonmovants and giving the benefit of all reasonable inferences in their favor. See Iacobucci v. Boulter, 193 F.3d 14, 22 (1st Cir. 1999). Given the posture of the case, the"discernible resolution of disputed factual issues" by the jury should be accorded deference. Id. at 23.

12

B.

Appellees' unreasonable search claim alleged that the entry by the officers into the dwelling by detonating a distraction device in the home and then entering without first announcing their presence or identifying themselves was unconstitutional. We conclude that Clark and Umstead were entitled to qualified immunity regarding this claim because the evidence, even when viewed in the light most favorable to Appellees, fails to establish a constitutional violation. Specifically, we determine that the officers possessed a reasonable suspicion that knocking and announcing their presence would be dangerous.

The Fourth Amendment provides, in pertinent part,"The right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The reasonableness inquiry under the Fourth Amendment includes the common law principle that law enforcement officers should knock and announce their presence and then wait a reasonable period of time before entering a residence.[7] See Wilson v. Arkansas, 514 U.S. 927, 931-34 (1995); Gould v. Davis, 165 F.3d 265, 270 (4th Cir. 1998). This requirement protects an individual's interest in avoiding the destruction of property that may be caused by a forcible entry and his interest in being able to prepare himself for an entry by law enforcement officers. See Richards v. Wisconsin, 520 U.S. 385, 393 n.5 (1997). These interests "should not be unduly minimized." Id. Another purpose of the knock and announce requirement, which is no less important, is to protect the officers and the occupants by preventing people in the home to be searched from responding with violence

_____

[7] The contours of the knock and announce requirement and the exceptions thereto are informed by reference to 18 U.S.C.A. § 3109 (West 1985), which states that an "officer may break open any outer or inner door or window of a house ... to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance." See Gould v. Davis, 165 F.3d 265, 270 n.1 (4th Cir. 1998). Because this statute is "expressive of the common law rule," Simons v. Montgomery County Police Officers, 762 F.2d 30, 33 (4th Cir. 1985), "it not only governs federal searches by federal agents, but also provides the proper framework for analyzing the execution of state search warrants," United States v. Kennedy, 32 F.3d 876, 882 (4th Cir. 1994).

13

against what they believe to be an entry by an unlawful intruder. See Sabbath v. United States, 391 U.S. 585, 589 (1968); Miller v. United States, 357 U.S. 301, 313 n.12 (1958); Bonner v. Anderson, 81 F.3d 472, 475 (4th Cir. 1996).

There are occasions, however, when it is reasonable under the Fourth Amendment for officers to dispense with the knock and announce requirement. Compliance is excused when the officers have "a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Richards, 520 U.S. at 394; see Gould, 165 F.3d at 270. Whether such "exigent circumstances" existed at the time of entry and whether those circumstances justified the means of entry employed is determined by analysis of the facts of each case. See United States v. Kennedy , 32 F.3d 876, 882 (4th Cir. 1994).

A "reasonable suspicion" is a "minimal level of objective justification." United States v. Sokolow, 490 U.S. 1, 7 (1989) (internal quotation marks omitted) (discussing the reasonable suspicion standard in the context of an investigatory detention stop under Terry v. Ohio, 392 U.S. 1 (1968)). When the suspicion is based on information provided by an informant, whether the suspicion is reasonable depends upon the totality of the circumstances. See Alabama v. White, 496 U.S. 325, 328 (1990). The informant's "`veracity,' `reliability,' and `basis of knowledge'" are all "`highly relevant in determining the value of his report.'" Id. (quoting Illinois v. Gates, 462 U.S. 213, 230 (1983)). The reasonable suspicion standard requires "more than an inchoate and unparticularized suspicion or hunch" but "considerably less than proof ... by a preponderance of the evidence." Id. at 329-30 (internal quotation marks omitted). It is also a lower standard than the "fair probability" standard necessary to establish probable cause. Id. at 330 (internal quotation marks omitted). The reasonable suspicion standard is lower than probable cause not only in the sense that it can be satisfied with less information than that required for probable cause, but also in the sense that it can be based on information that is not as reliable as that required to show probable cause. See id.

14

We conclude that exigent circumstances existed justifying the method of entry employed.**8** In reaching our conclusion, we first evaluate the reliability and content of the information that the officers possessed. We then explain why, contrary to Appellees' assertions, United States v. Lalor, 996 F.2d 1578 (4th Cir. 1993), and Gould v. Davis, 165 F.3d 265 (4th Cir. 1998), do not dictate a different result.

1.

We first consider the reliability of the information on which the officers based their decision to use a no-knock entry and distraction device.**9** Hamlet was an informant with whom Clark had no prior experience.**10** Nevertheless, her story may have had presumptive reliability

_____

**8** Appellees contend that the verdict on the unreasonable search claim should be affirmed on the basis that the evidence was sufficient to establish an unreasonable seizure. However, because the jury was not presented with the question of whether the conduct underlying the unreasonable search claim constituted an unreasonable seizure, we need not address this argument. Furthermore, because we conclude that exigent circumstances existed, we need not decide whether Appellees had a legitimate expectation of privacy in the Stone Drive residence. See Rakas v. Illinois, 439 U.S. 128, 143 (1978).

**9** Appellees contend that the three informants had little reliability because they may have been providing information to law enforcement in hopes that charges would not be brought against them. However, undisputed evidence in the record demonstrated that the informants had already been advised that they would not be charged when they made their statements. In any event, had the informants had an interest in obtaining leniency from the authorities, that interest would have provided "a strong motive to supply accurate information." United States v. Miller, 925 F.2d 695, 699 (4th Cir. 1991). But see 2 Wayne R. LaFave, Search and Seizure § 3.4(a), at 220 (3d ed. 1996) (explaining that if an informant is providing information because he has been implicated in another crime and is hoping to obtain leniency, "the more strict rules regarding the showing of veracity applicable to an informer from the criminal milieu must be followed").

Appellants make several arguments that the district court abused its discretion in admitting evidence concerning the reliability of the information the officers possessed. We find these arguments to be wholly without merit.

**10** Although Appellees contend that the information provided by all three informants was unreliable, we focus primarily on Hamlet's infor-

15

if she had been "not a professional informant, but a private citizen with no known criminal record or other criminal contacts, who came forward on [her] own." United States v. Campbell, 732 F.2d 1017, 1019 (1st Cir. 1984). That is not the case here, however. Based on the information known to the officers, Hamlet could be fairly described as a 14-year-old runaway who had been found in a hotel room with two boys, ages 15 and 18, and who claimed to have spent the night at a drug dealer's house even after personally observing a drug transaction take place in the living room. Under these circumstances, Hamlet cannot be deemed reliable merely by virtue of having provided information to law enforcement. See United States v. Decoteau, 932 F.2d 1205, 1207 (7th Cir. 1991) (stating that police should proceed with "caution" regarding reports "of victimless or status crimes"); 2 Wayne R. LaFave, Search and Seizure§ 3.4(a), at 220-21 (3d ed. 1996) (explaining that "[p]olice claims that their information was received from an average citizen who was ... a witness to criminal activity should be viewed with healthy skepticism when the nature of the criminal conduct alleged and the relationship of the `citizen' to that activity is more typical of that found when informants from the criminal milieu are utilized"); cf. United States v. Wilhelm, 80 F.3d 116, 120-21 (4th Cir. 1996) (holding that anonymous informant was not presumptively reliable merely because he supplied information about marijuana being present and sold in defendant's home). But see United States v. Rowell, 903 F.2d 899, 900, 903 (2d Cir. 1990) (holding that named informants, one of whom claimed to have seen defendant complete several large drug transactions and the other of whom claimed to have been in the basement office of defendant's business when defendant was in possession of a large amount of cocaine, were "witnesses" whose reliability could be presumed).

Appellees contend that Hamlet's information was unreliable because it was inherently unbelievable. It certainly would be surprising, as Appellees point out, if Bryant had allowed Hamlet to witness him making a sale of cocaine, revealed to her where he kept his marijuana, and allowed her to enter his closet where he allegedly stored two "big bags of cocaine." J.A. 1658. Common sense suggests, and

_____

mation because Hamlet provided by far the most important information regarding the existence of exigent circumstances.

16

Appellees' law enforcement expert testified, that drug dealers are usually more circumspect. The fact that Hamlet, at the time Clark interviewed her, was wearing a clean shirt that appeared to be "too big for her," however, corroborated to some extent her claim that she had seen the contents of Bryant's closet when she was searching for clean clothes to wear. J.A. 507; see Lalor, 996 F.2d at 1581 ("Corroboration of apparently innocent details of an informant's report tends to indicate that other aspects of the report are also correct."). And, Hamlet's willingness to admit, in the presence of her father, that she could identify marijuana because she had used marijuana previously gave Officer Clark reason to suspect that Hamlet was not simply framing her information to her own interests. Cf. Rowell, 903 F.2d at 903 (noting that an informant's reliability is enhanced by a statement against penal interest).

Appellees maintain that Clark had reason to doubt Hamlet's truthfulness because Rogers' and Smith's statements did not corroborate Hamlet's. However, Smith's statement corroborated Hamlet's to the extent that both claimed that those in the house had access to firearms and marijuana. And, Rogers' statement corroborated Hamlet's to the extent that both alleged that underage drinking occurred at the house. Furthermore, it is important to note that Hamlet claimed to have spent the night in the home on Friday, whereas Rogers and Smith claimed to have been present in the residence only for a short time on Saturday. Accordingly, the fact that Hamlet identified items in the residence that Rogers and Smith did not identify does not detract significantly from the believability of any of the statements.**11**

The concerns that a reasonable officer would have had regarding Hamlet's veracity are mitigated to some extent by the strength of Hamlet's asserted basis of knowledge for much of her information. See Illinois v. Gates, 462 U.S. 213, 233 (1983) (explaining that a deficiency in veracity can be compensated for by a strong basis of knowl-

_____

**11** We note that although Rogers' and Smith's information corroborated Hamlet's to a limited extent, Rogers' and Smith's claims that the Stone Drive residence was home to the "South Side Crypts" are of little value since Clark did not know the basis on which Rogers and Smith drew that conclusion, and Clark had no other reliable information that such a gang even existed.

17

edge). Indeed, Hamlet and Smith both claimed to have recently observed firsthand the weapons and drugs they reported.**12** And, Hamlet described the location of the guns and drugs in the house in detail. <u>Cf. id.</u> at 234 ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.").

Weighing all of these factors together, we conclude that although Hamlet's information had some indicia of reliability, the officers had reason to be very skeptical of its accuracy. Nevertheless, if Hamlet's information were accurate, a reasonable officer would have reason to suspect that Bryant was a heavily armed drug dealer who would resist violently if he were home when the warrant was executed. <u>See Kennedy</u>, 32 F.3d at 882 (explaining that "`entrance into a situs of drug trafficking activity carries all too real dangers to law enforcement officers'" (quoting <u>United States v. Bonner</u>, 874 F.2d 822, 827 (D.C. Cir. 1989)). And, by knocking and announcing their presence and then waiting a reasonable time, the SRT would give Bryant time to prepare an attack. Considering the extreme danger that the officers faced, we hold that exigent circumstances existed despite the questionable reliability of the information. <u>See White</u>, 496 U.S. at 330 (explaining that the existence of reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability").

2.

Appellees maintain that <u>United States v. Lalor</u> and <u>Gould v. Davis</u> necessitate a different conclusion. For the reasons set forth below, we disagree. We discuss these two cases and arguments seriatim.

In <u>Lalor</u>, the police, in executing a search warrant identifying cocaine as one of the items sought, performed a no-knock entry into the dwelling to be searched. <u>See Lalor</u>, 996 F.2d at 1579-80. In determining that the method of entry was reasonable, the district court

_____

**12** Hamlet did reveal to Clark, however, that she only assumed the white powder that she observed Bryant sell and that she saw in Bryant's closet was cocaine.

18

relied in part on the facts that evidence of drug activity is easily destroyed and that the affiant police officer had asserted that a risk of destruction of evidence existed. See id. at 1584. We concluded that this basis was insufficient to warrant a no-knock entry because "[t]here is no support for the proposition that each and every narcotics search carries a risk that evidence will be destroyed." Id. We reasoned that "the police had no particularized basis for their belief that evidence would be destroyed" given that no evidence indicated that drugs would be found in the house and the police "did not even know who was in the house at the time of the search." Id. at 1584 & n.8. We nevertheless affirmed, as not clearly erroneous, the finding by the district court that exigent circumstances existed because a weapon had been found during a previous arrest of Lalor and Lalor had been belligerent and had made derogatory comments about the police in another encounter with police. See id. at 1584-85.

According to Appellees, Lalor establishes that the evidence was not sufficiently particularized with regard to Bryant's inclination to violently resist law enforcement officers to support a reasonable suspicion that knocking and announcing would be dangerous. We disagree and believe Lalor is distinguishable because the evidence here that knocking and announcing would be dangerous was far more particularized than the evidence in Lalor that drugs would be destroyed. It is true that in both cases the officers lacked information about who was in the residence to be searched. But in Lalor, the officers also lacked information that any evidence would even be present in the residence that could be destroyed. Here, by contrast, the officers had been told that Bryant was a heavily armed drug dealer and that he had readily accessible firearms in the room into which the front door opened. Accordingly, we do not believe Lalor controls the result here.

Appellees contend that Gould v. Davis also establishes that the officers' entry into the house was unconstitutional. In Gould, law enforcement officers had information that a suspect who was in custody for his suspected role in a series of armed robberies frequently stayed at his father's home. See Gould, 165 F.3d at 267-68. The officers obtained a search warrant to search the home for evidence tying the suspect to the robberies, including two handguns. See id. at 268. In executing the search warrant, officers entered without knocking and announcing their presence. See id. We rejected the argument that

19

the officers were entitled to qualified immunity regarding their method of entering the home, reasoning that it was clearly established at the time of the entry that concerns of officer safety did not justify a no-knock entry when law enforcement had no information that anyone in the house was likely to use violence against the officers. See id. at 271-72. Specifically, this court stated that a reasonable fear for officer safety sufficient to justify a no-knock entry "must include a belief, not simply that a gun may be located within a home, but that someone inside the home might be willing to use it." Id. at 272. Appellees contend that since the officers had no information regarding who would be in the house at the time of the raid, Gould dictates that their method of entry was unconstitutional.

We believe Gould is distinguishable from the present case. While it is true that the officers did not have specific information that Bryant would be home at the time of execution of the search warrant, they did know that he lived at the house to be searched. Therefore, although the lack of information that Bryant would be home lessened the expectation that the officers would encounter violent resistance if they knocked and announced, we decline to hold that exigent circumstances did not exist without such information. Rather, we believe the officers were entitled to consider that there was a significant probability that Bryant would be home at 5:30 on that Sunday afternoon, especially considering that two vehicles were parked in front of the residence when the raid occurred. Cf. United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995) (explaining that "officers may presume that a person is at home at certain times of the day--a presumption which can be rebutted by contrary evidence"); United States v. Terry, 702 F.2d 299, 319 (2d Cir. 1983) (holding that police had reason to believe suspect would be home at 8:45 a.m. on Sunday for purpose of executing arrest warrant and rejecting "contention that the police must first conduct a thorough investigation to obtain evidence of an arrestee's actual presence before entering his residence").

Because exigent circumstances existed, we hold that the officers' method of entry was reasonable and that the officers therefore were entitled to qualified immunity regarding the unreasonable search

20

claim. Accordingly, the district court erred in denying Clark and Umstead's motion for judgment as a matter of law on that claim.[13]

III.

Clark maintains that the district court erred in denying his motion for judgment as a matter of law on the illegal seizure claim arising out of the arrest of Appellees. Appellees claimed, and the jury found at trial, that Clark did not have probable cause to make the arrests and therefore that Appellees were unreasonably seized in violation of the Fourth Amendment. Clark asserts that he is entitled to qualified immunity because a reasonable officer could have believed under the circumstances that probable cause existed. We agree.

Probable cause to justify an arrest exists when"the facts and circumstances within the arresting officer's knowledge are sufficient for a reasonable person to believe that a crime has been or is being committed by the person to be arrested." United States v. Miller, 925 F.2d 695, 698 (4th Cir. 1991). Probable cause must be supported by more than mere suspicion, but need not consist of evidence sufficient to convict. See Wong Sun v. United States, 371 U.S. 471, 479 (1963); United States v. Gray, 137 F.3d 765, 769 (4th Cir.) (en banc), cert. denied, 119 S. Ct. 157 (1998). When determining what a "reasonable

_____

[13] Appellees argue that regardless of whether the officers had a reasonable suspicion that officer safety required the method of entry employed, the jury reasonably could have found that the officers violated the Fourth Amendment by failing to undertake a reasonable investigation to obtain further information. We need not decide whether the Constitution requires a law enforcement officer who has a reasonable suspicion that safety concerns require him to perform a no-knock entry to first undertake a reasonable investigation because Appellees advance no investigation that Clark was unreasonable in failing to undertake. Appellees claim that Clark should have conducted "some type of minimal surveillance" and should have conducted "some type of minimal investigation" of Bryant. Brief of Appellees at 38. It is not clear what purpose such measures would have advanced here, however. Had Clark conducted surveillance of the house and checked into Bryant's background, and had his investigation uncovered nothing suspicious, the officers still would have been left with information that gave them a reasonable suspicion that a no-knock entry would be appropriate.

person" could believe, we consider the expertise and experience of the law enforcement officers. See, e.g., United States v. Ortiz, 422 U.S. 891, 897 (1975).

Clark arrested Appellees for violation of a South Carolina statute prohibiting the possession of alcohol by minors. That statute provided in relevant part: "It is unlawful for any person under the age of twenty-one years to purchase, or knowingly have in his possession, any alcoholic liquors. Any possession is prima facie evidence that it was knowingly possessed." S.C. Code Ann. § 20-7-380.

The question of whether Clark had probable cause to arrest Appellees is a close one. Clark had been informed by Hamlet that "[a] lot of underage people are always [in the Stone Drive residence] drinking and smoking." J.A. 1658. Rogers had also claimed to have witnessed underage drinking in the house. When the officers entered the home they found a number of unsupervised juveniles there, as Hamlet's information suggested that they would. They also discovered a number of liquor bottles in the pantry, corroborating Hamlet's allegation that underage drinking was a common occurrence at the residence. Clark was advised by Rowland that fruit punch commonly was used as a mixer for alcoholic beverages by juveniles who wished to drink. Therefore, when the officers discovered a pitcher of what appeared to be fruit punch on the kitchen counter and some cups of the beverage in the living room, it was reasonable for Clark to believe that the beverage contained alcohol.[14] And, even without observing Appellees in actual possession of the beverage, a reasonable officer could have believed that Appellees constructively possessed it by virtue of their proximity to the beverage. See State v. Brownlee , 455 S.E.2d 704, 706 (S.C. Ct. App. 1995) (explaining that a person's presence in proximity to contraband may give rise to a reasonable inference that the person intends to exercise dominion and control over the contraband). Accordingly, we hold that Clark had probable cause to arrest Appel-

_____

[14] Testimony established that the smell of punch-based drinks masks the odor of the clear liquor with which they are mixed. Accordingly, the fact that the Kool-Aid did not smell of alcohol would not significantly reduce the suspicion of a reasonable officer.

22

lees and the district court erred in denying him judgment as a matter of law on this claim on the basis of qualified immunity.**15**

IV.

The City of Aiken contends that the district court erred in denying its motion for judgment as a matter of law on Appellees' assault claim.**16** We conclude that a reasonable jury could find against the City on its legal justification defense and that the district court properly denied the City's motion for a new trial or new trial nisi remittitur.

A.

Under South Carolina law, the tort of assault occurs"when a person has been placed in reasonable fear of bodily harm by the conduct of the defendant." Gathers v. Harris Teeter Supermarket, Inc., 317 S.E.2d 748, 754-55 (S.C. Ct. App. 1984). The City does not dispute that evidence in the record supports a reasonable conclusion that the officers placed Appellees in reasonable fear of bodily harm by detonating the distraction device and entering the home with weapons

_____

**15** We note that the information that underage drinking was a common occurrence in the Stone Drive residence, the apparent corroboration of that tip by the discovery of the liquor bottles in the pantry, and the fact that the substance on the counter appeared to be a mixer commonly used by juveniles for alcoholic beverages are critical to the result we reach. The mere presence of unsupervised minors in a home in which alcoholic beverages are located would not alone give rise to probable cause to arrest the minors for possession of alcoholic liquors.

**16** The City contends that the district court abused its discretion in submitting the assault claim to the jury because Appellees waived the claim. The City asserts that in support of its motion for summary judgment, the City argued that the assault claim should be dismissed as redundant of the unreasonable search claim and that Appellees did not respond. The City maintains that the parties thereafter understood that the assault claim was withdrawn. The City does not assert, however, that any order of dismissal was entered. And, when questioned by the district court concerning whether the claim had been withdrawn, Appellees answered that it had not. Under the circumstances, we believe the court was well within its discretion in submitting the claim to the jury.

23

drawn and without identifying themselves.**17** See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 10, at 43-44 (5th ed. 1984) (explaining that it is an assault to hold a weapon "in a threatening position," "to surround another with a display of force," "to chase another in a hostile manner," or to "set[ ] off an explosion which puts

_____

**17** The parties have changed their positions regarding which acts constitute the basis for the assault claim. Appellees, in their closing argument, described to the jury the conduct of the officers that they claimed constituted an assault:

> [T]heir throwing this bomb in here created a tremendous amount of fear in these children.
>
> Remember Nicole up there on the stand, talking about as she was sitting in the kitchen, the fear, she thought she was going to die? She didn't know what was going on. You saw the outfits--we don't have them here today--but the hoods, the goggles, 30 rounds of automatic weapons, eight men running in violently after a violent explosion, who wouldn't think they were going to die?

J.A. 1295. In arguing that the verdict on the unreasonable search claim and the assault verdict were not duplicative, Appellees stated in their brief that only "the pointing and presenting of the firearms once the officers had gained entry in the house" formed the basis for the assault claim. Brief of Appellees at 50. Seizing on this statement, the City argued in its Reply Brief that the detonation of the distraction device and entry into the house were not in fact part of the basis for Appellees' assault claim, and that only the presentation and pointing of the weapons once the officers had gained entry into the house formed the basis for the claim. Nevertheless, the City conceded in its initial brief that the basis for Appellees' assault claim included the use of the distraction device and the forced entry into the home. And, more importantly, we believe the record, particularly Appellees' closing argument, makes clear that the basis for the assault claim included the conduct discussed by Appellees in their closing argument. Accordingly, we do not address the City's argument that mere evidence that the officers pointed weapons at Appellees would not be sufficient to support a verdict for Appellees on their assault claim.

We also reject as wholly without merit the City's contention that the fact that the officers were carrying out a valid search warrant mandates a conclusion that the specific method they employed to enter the home was legally justified.

24

the plaintiff in fear of life or safety"). Rather, the City's argument that the district court erred in denying its motion for judgment as a matter of law is based on the assertion that the officers' conduct was "lawful and reasonable." J.A. 1360 (jury charge). Under South Carolina law, "[a] police officer who uses reasonable force... is not liable for assault." Roberts v. City of Forest Acres, 902 F. Supp. 662, 671-72 (D.S.C. 1995) (footnote omitted). However, "if a police officer uses excessive force, or `force greater than is reasonably necessary under the circumstances,' he may be liable for assault." Id. at 671 n.2 (quoting Moody v. Ferguson, 732 F. Supp. 627, 632 (D.S.C. 1989)). Accordingly, the City was entitled to judgment as a matter of law only if the force the officers employed to enter and gain control of the residence was reasonably necessary as a matter of law.

In the context of Clark and Umstead's claim of entitlement to qualified immunity regarding Appellees' Fourth Amendment unreasonable search claim, we have concluded that the officers' entry was not unconstitutional. However, whether the entry constituted unreasonable or excessive force for purposes of determining liability for assault under South Carolina common law is a separate question. First, an action that does not violate the Fourth Amendment may violate state law. See Wilcher v. City of Wilmington, 139 F.3d 366, 380 (3d Cir. 1998) (stating that "[t]he district court's assumption that `reasonableness' under the Fourth Amendment is analogous to a `reasonable person' standard under state common law is erroneous"); Myrick v. Cooley, 371 S.E.2d 492, 494, 497 (N.C. Ct. App. 1988) (explaining that "it is possible, in some instances, for an arrest to be constitutionally valid and yet illegal under state law" and holding that evidence was sufficient to justify a finding of common law assault and battery even though it was insufficient to prove a constitutional tort). Second, although the "reasonableness" inquiry in the first step of a qualified immunity analysis is a question for the court, the reasonableness inquiry in the common law context is a fact question for the jury unless reasonable minds could not disagree regarding the outcome. See Davis v. Piedmont Eng'rs, Architects & Planners, P.A., 324 S.E.2d 325, 326 (S.C. Ct. App. 1984) (explaining that whether an act is unreasonable may be a factual question even when the act itself is not disputed); cf. Myrick, 371 S.E.2d at 496 (explaining that "[a]lthough the officer has discretion, within reasonable limits, to judge the degree of force required under the circumstances, when

25

there is substantial evidence of unusual force," the question of whether the force was excessive is for the jury (internal quotation marks omitted)).

A motion for judgment as a matter of law should be granted if the district court determines, "without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings." Konkel v. Bob Evans Farms Inc., 165 F.3d 275, 279 (4th Cir.), cert. denied, 120 S. Ct. 184 (1999). We review the decision of the district court to deny judgment as a matter of law de novo, viewing the facts in the light most favorable to the nonmoving party. See id. "The question is whether a jury, viewing the evidence in the light most favorable to [Appellees], could have properly reached the conclusion reached by this jury." Benesh v. Amphenol Corp. (In re Wildewood Litigation), 52 F.3d 499, 502 (4th Cir. 1995). We must reverse if a reasonable jury could only rule in favor of the City; if reasonable minds could disagree, we must affirm. See Sales v. Grant, 158 F.3d 768, 775 (4th Cir. 1998).

Although we have determined that the method of entry into the residence did not violate the Fourth Amendment because of the presence of exigent circumstances, reasonable minds could disagree as to whether the officers' aggressive tactics were reasonably necessary as a factual matter. It must be remembered that a primary purpose of the knock and announce rule is "to safeguard officers, who might be mistaken, upon an unannounced intrusion into a home, for someone with no right to be there." Sabbath, 391 U.S. at 589. A no-knock entry nevertheless can be reasonably necessary when the danger avoided by the no-knock entry is greater than the danger created. However, because we are unable to say that no rational jury could find that the officers' tactics were unreasonable, we hold that the district court did not err in denying the City's motion for judgment as a matter of law.

First, the information that the officers possessed did not give rise to a particularly strong inference that they would meet violent resistance if they knocked, announced, and waited. The contingency that the officers feared--that Bryant would violently resist them if they knocked and announced--rested on layer upon layer of inferences: that the information of questionable reliability that the officers possessed was accurate; that Bryant would be in the residence when the

26

raid occurred; and that Bryant would be inclined to use violence against law enforcement officers. If any one of those inferences turned out not to be true, then the officers were more likely creating than diminishing danger by employing their aggressive tactics.

Indeed, it would not be unreasonable for a jury to conclude that the information possessed by the officers that there were one or more firearms in the living room and the decision by the officers to detonate the distraction device both enhanced the likelihood of a violent confrontation. A reasonable officer would have been aware that there was a significant possibility that someone within reach of a weapon, upon seeing the front door open and a masked man standing behind it tossing something into the room, would pick up the weapon and seek to defend himself. See People v. Dumas, 512 P.2d 1208, 1213 (Cal. 1973) (in bank) (explaining that the danger that "a startled and fearful householder suddenly confronted with unknown persons breaking into his home for unannounced reasons" will violently resist "is obviously intensified when the householder is in possession of a firearm"). When the officers proceeded to set off an explosion in the living room and enter without identifying themselves as law enforcement officers, it would not be unreasonable to expect that those inside would seek to defend themselves by any means possible.

Considering the obvious possibility that the method of entry employed by the officers would cause a violent confrontation rather than prevent one, a reasonable officer would have considered whether those dangers were outweighed by dangers the plan could be expected to prevent. Had Hamlet's information been true, had Bryant been in the house, and had he been inclined to shoot at a law enforcement officer, the fact remains that during the time it took to open the door, toss in the distraction device, and allow it to detonate, the officers gave Bryant several seconds to pick up the weapon they had reason to expect he would have close by. See supra note 4. The City points to no evidence in the record regarding how effective a distraction device is in preventing someone from shooting law enforcement officers once he has picked up a gun.**18** Accordingly, a reasonable jury

_____

**18** It seems unlikely that the officers hoped that Bryant would not see them as they opened his front door wide enough to survey the living room to determine where the bomb should be tossed, especially considering that the record demonstrates that the officers were expecting the occupants of the residence to be in the living room.

27

could conclude that the substantial risk of a violent confrontation created by the use of a distraction device and the method of entry employed by the officers was not counterbalanced by any substantial benefit the officers reasonably could be expected to gain from their aggressive tactics.

In light of all of these considerations, we conclude that a reasonable jury could have found that the force employed by the officers was not reasonably necessary to execute the search warrant. We therefore affirm the denial by the district court of the City's motion for judgment as a matter of law on this claim.**19**

B.

The City next maintains that the district court erred in denying its motion for a new trial or a new trial nisi remittitur, see Fed. R. Civ. P. 59(a), because the verdict on the assault claim was excessive. We disagree. A federal court determining whether a verdict on a state law claim is excessive must apply state law rules for evaluating an allegedly excessive verdict. See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 428-31 (1996); Konkel, 165 F.3d at 280. Under South Carolina law, the appellate court will reverse the denial of a request for a remittitur "only if (1) the refusal to remit was controlled by an error of law, ... or (2) a new trial absolute should have been granted." Knoke v. South Carolina Dep't of Parks, Recreation & Tourism, 478 S.E.2d 256, 258 (S.C. 1996). "A new trial absolute should be granted only if the verdict is so grossly excessive that it shocks the conscience of the court and clearly indicates the amount of the verdict was the result of caprice, passion, prejudice, partiality, corruption, or other improper motive." Id.

Here, once Appellees proved liability for assault, they clearly were entitled to damages for having been placed in fear of imminent bodily harm. Cf. Restatement (Second) of Torts§ 905 cmt. c (1979) (explaining that the principal element of damages in an assault action gener-

_____

**19** Because we reverse the denial of the City's motion for judgment as a matter of law on the unreasonable search claim, we need not address the City's contention that the damages alleged under the assault cause of action are duplicative of those alleged in the constitutional claim.

28

ally is "the disagreeable emotion experienced by the plaintiff"). The City does not identify any error of law by the district court in denying remittitur, and we cannot conclude that the jury verdict was the product of any improper motives or that the amount shocks the conscience. Accordingly, the district court correctly denied the City's motion.

V.

In sum, we reverse the denial of the motions for judgment as a matter of law on the unreasonable search claim and the unreasonable seizure claim on the basis that Clark and Umstead were entitled to qualified immunity, and we affirm the denial of the City's motion for judgment as a matter of law regarding the state law assault claim. We also affirm the denial of the City's motion for new trial absolute or new trial nisi remittitur. Because we reverse the denial of judgment as a matter of law on the Fourth Amendment claims, we vacate the award of attorneys' fees and costs and remand for reconsideration of the amount to be awarded.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

29